## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GREGORY CORWIN, Individually and on Behalf of All Others Similarly Situated, | **C.A. No:** |
| Plaintiff, | |
| v. | **COMPLAINT – CLASS ACTION FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| KERYX BIOPHARMACEUTICALS, INC., KEVIN J. CAMERON, MARK J. ENYEDY, STEVEN C. GILMAN, MICHAEL T. HEFFERNAN, JODIE MORRISON, DANIEL P. REGAN, and MICHAEL ROGERS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Gregory Corwin ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and on behalf of all other similarly situated public common shareholders of Keryx Biopharmaceuticals, Inc. ("Keryx" or the "Company") against Keryx and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and together with Keryx, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S,C. §§ 78n(a), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Keryx by Akebia Therapeutics, Inc. ("Akebia").

2. On June 28, 2018, Keryx, Akebia, and Alpha Therapeutics Merger Sub, Inc., a wholly owned subsidiary of Akebia ( "Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Keryx, with Keryx becoming a wholly owned subsidiary of Akebia (the "Proposed Transaction").

3. Pursuant to the terms of the Merger Agreement, each issued and outstanding share of Keryx common stock of will be converted into the right to receive 0.37433 shares of Akebia common stock (the "Merger Consideration").

4. On October 1, 2018, in order to convince Keryx's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Registration Statement on a Form S-4 (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Keryx; (ii) the valuation analyses conducted by MTS Securities, LLC ("MTS Securities"), an affiliate of the Company's financial advisor, MTS Health Partners, L.P., in support of its fairness opinion; and (iii) the Board's potential conflict of interest.

6. The special meeting of Keryx's public common shareholders to vote on the Proposed Transaction is forthcoming. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Keryx's

public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9. This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Keryx is incorporated under the laws of this District.

## PARTIES

11. Plaintiff is, and has been at all relevant times, a shareholder of Keryx common stock.

12. Defendant Keryx is a Delaware corporation with its principal executive offices at One Marina Park Drive, 12th Floor, Boston, Massachusetts 02210. Keryx is a commercial stage biopharmaceutical company focused on bringing innovative medicines to people with kidney disease. The Company's common stock trades on the NASDAQ under the ticker symbol "KERX".

13. Defendant Kevin J. Cameron is, and has been at all relevant times, a director of Keryx.

14.     Defendant Mark J. Enyedy is, and has been at all relevant times, a director of Keryx.

15.     Defendant Steven C. Gilman is, and has been at all relevant times, a director of Keryx.

16.     Defendant Michael T. Heffernan is, and has been at all relevant times, a director of Keryx.

17.     Defendant Jodie Morrison is, and has been at all relevant times, a director of Keryx, and currently serves as the Company's Interim Chief Executive Officer.

18.     Defendant Daniel P. Regan is, and has been at all relevant times, a director of Keryx.

19.     Defendant Michael Rogers is, and has been at all relevant times, a director of Keryx, and currently serves as the Chairman of the Board.

20.     The parties in paragraphs 13 through 19 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Keryx the "Defendants."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public common shareholders of Keryx (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

    a) the Class is so numerous that joinder of all members is impracticable. As of July 31, 2018, there were approximately 120.46 million shares of Keryx common stock outstanding, held by hundreds to thousands of individuals and

entities scattered throughout the country.  The actual number of public Keryx shareholders will be ascertained through discovery;

b) there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

    i.    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

    ii.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c) Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d) Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f)   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g)   a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.   Background of the Company and the Proposed Transaction

23.   Keryx is a commercial stage biopharmaceutical company focused on bringing innovative medicines to people with kidney disease.  Keryx's marketed product, Auryxia[®] (ferric citrate) tablets, is an orally available, absorbable, iron-based medicine.  Auryxia is approved by the U.S. Food and Drug Administration (the "FDA"), for the control of serum phosphorus levels in patients with chronic kidney disease ("CKD"), on dialysis and for the treatment of iron deficiency anemia in adults with CKD, not on dialysis.  Ferric citrate is also approved in Japan under the trade name Riona[®] and marketed by Keryx's Japanese partner, Japan Tobacco, Inc. and its subsidiary, Torii Pharmaceutical Co., Ltd., and approved in Europe as Fexeric[®].

24.   Akebia is a biopharmaceutical company focused on developing and commercializing novel therapeutics for patients based on hypoxia-inducible factor ("HIF") biology, and building its pipeline while leveraging its development and commercial expertise in renal disease.  HIF is the primary regulator of the production of red blood cells in the body, as well as other important metabolic functions.  Pharmacologic modulation of the HIF pathway may have broad therapeutic applications.  Akebia's lead product candidate, vadadustat, is an oral therapy in Phase 3 development and has the potential to set a new standard of care in the treatment of anemia due to CKD.

25.     On June 28, 2018, Keryx and Akebia issued a joint press release announcing the

Proposed Transaction.  The press released, stated in relevant part:

### Akebia Therapeutics and Keryx Biopharmaceuticals to Merge, Creating a Fully Integrated Company Focused on the Development and Commercialization of Therapeutics for Patients with Kidney Disease

*Expects to Capture Significant Operating and Product Portfolio Synergies,*
*Accelerating Revenue Growth and Creating Shareholder Value*

*Consolidates an FDA-Approved Oral CKD Product and an Investigational, Phase 3 Oral CKD Product Candidate Under Combined Experienced Renal Leadership Team*

*Largest Keryx Shareholder, The Baupost Group, Agrees to Convert Outstanding Notes Prior to Close; Enters Shareholder Voting Agreement in Support of Transaction*

*John P. Butler to Be President and Chief Executive Officer of Combined Company; Keryx to Appoint Chairperson of the Board*

*Companies to Host Investor Conference Call Today at 8:00 a.m. ET*

CAMBRIDGE and BOSTON, Mass. – June 28, 2018 – Akebia Therapeutics, Inc. (NASDAQ:AKBA) and Keryx Biopharmaceuticals, Inc. (NASDAQ:KERX) today announced that the companies signed, and the boards of directors of both companies have unanimously approved, a definitive merger agreement under which the companies will combine in an all-stock merger. The transaction will create a fully integrated biopharmaceutical company focused on chronic kidney disease (CKD), with an implied pro forma equity value of approximately $1.3 billion, assuming full conversion of Keryx's outstanding convertible notes, based on the closing prices of Keryx and Akebia on June 27, 2018. The combined company will be named Akebia Therapeutics, Inc.

Under the terms of the agreement, Keryx shareholders will receive 0.37433 common shares of Akebia for each share of Keryx they own. The exchange results in implied equity ownership in the combined company of 49.4 percent for Akebia shareholders and 50.6 percent for Keryx shareholders on a fully-diluted basis. John P. Butler, President and Chief Executive Officer of Akebia, is expected to lead the combined company, and Keryx will appoint the Chairperson of the Board of Directors of the combined company. Additionally, Jason A. Amello, Akebia's Chief Financial Officer,

is expected to serve in the same capacity on the management team of the combined company.

The Baupost Group, L.L.C., which owns approximately 21.4 percent of the outstanding Keryx common stock prior to any conversion of its convertible notes, has agreed to convert its outstanding convertible notes of Keryx into shares of Keryx common stock prior to closing and has entered into a voting agreement in support of the transaction. Muneer A. Satter, Chairperson of the Akebia Board of Directors and a shareholder who owns approximately 5.3 percent of outstanding Akebia common stock, has also agreed to support the transaction by entering into a voting agreement.

The merger of Akebia and Keryx creates a renal-focused company committed to developing and delivering innovative therapeutic products. Keryx's Auryxia® (ferric citrate) is a U.S. Food and Drug Administration (FDA)-approved medicine to treat dialysis dependent CKD patients for hyperphosphatemia and non-dialysis dependent CKD patients for iron deficiency anemia (IDA). Akebia's vadadustat is an investigational Phase 3 oral hypoxia-inducible factor prolyl hydroxylase inhibitor (HIF-PHI) with the potential to advance the treatment of patients with anemia due to CKD, many of whom are currently receiving injectable erythropoietin-stimulating agents (ESAs).

The companies believe that Auryxia and vadadustat, if FDA-approved, have the potential to deliver an all-oral treatment approach for patients with anemia due to CKD. More broadly, the combined company has the potential to offer therapeutic options to patients across all stages of CKD, including non-dialysis dependent and dialysis dependent patients, and to become a partner of choice for the renal community and for companies developing renal products.

John P. Butler, President and Chief Executive Officer of Akebia, said: "The strategic and financial drivers of this merger are compelling. The combined company will have an expanded and highly complementary nephrology portfolio, with Auryxia, a product with significant growth opportunity, and vadadustat, an investigational late-stage HIF-PHI that has the potential to provide a new oral standard of care to patients with anemia due to CKD. Combining Akebia and Keryx creates a leading renal company and provides it with the infrastructure to maximize the market potential of Auryxia and build launch momentum for vadadustat in the United States, subject to FDA approval. I look forward to leading the talented teams of both Akebia and Keryx as we work to establish new standards of renal care and unlock growth potential for shareholders."

Jodie Morrison, Interim Chief Executive Officer of Keryx, said: "Bringing Keryx together with Akebia represents a unique, value-enhancing

opportunity for stakeholders of both companies. Akebia shareholders gain access to the only oral iron tablet approved in the United States to treat dialysis dependent CKD patients for hyperphosphatemia and non-dialysis dependent CKD patients for iron deficiency anemia. Keryx shareholders gain access to an innovative Phase 3 product candidate with the potential to compete in a complementary multi-billion-dollar market upon successful completion of its development program. Importantly, Keryx shareholders also gain a seasoned executive with decades of experience in the renal field to lead our organization. I look forward to working with our management team during this transition period to continue to deliver on our mission to bring innovative medicines to people living with kidney disease."

"Akebia and Keryx bring together assets and capabilities that should lead to new business opportunities and substantial realizable synergies," said Greg Ciongoli, Partner, The Baupost Group. "The combined company will be well positioned for future growth."

**Strategic Rationale**
The merger offers potential operating and product portfolio synergies, with the opportunity to create significant value and accelerate the growth potential beyond what either company would achieve separately.

**Establishes a Leading Renal Company with Enhanced Position and Large Market Opportunity**
Combining Akebia and Keryx is expected to create a sustainable, kidney disease-focused, therapeutic leader that is well positioned to be a partner of choice throughout the renal community and for companies with products for patients with kidney disease. The merger creates a fully integrated renal company with a complementary portfolio comprising Keryx's FDA-approved Auryxia and Akebia's product candidate, vadadustat.

Auryxia is a phosphate binder indicated for the control of serum phosphorus levels in adult patients with CKD on dialysis, and an iron replacement product indicated for the treatment of iron deficiency anemia in adult patients with CKD who are not on dialysis. The approval and commercialization of Auryxia provides a new prescription oral treatment option for the millions of CKD patients with either hyperphosphatemia or iron deficiency anemia.

Vadadustat is a once-daily, oral investigational drug being studied in large-scale global Phase 3 clinical trials in both non-dialysis dependent and dialysis dependent patients with anemia due to CKD. Vadadustat's mechanism of action is designed to mimic the physiologic effect of altitude on oxygen availability. Vadadustat has the potential to become a new standard of care for patients with anemia due to CKD who currently rely on injectable ESAs, a multi-billion-dollar market.

The combined company will have the opportunity to provide nephrologists with a portfolio of renal products, subject to vadadustat's FDA approval, that can address the needs of an estimated 1.7 million patients who are non-dialysis dependent and 500,000 dialysis-dependent patients in the United States, across the continuum of CKD.

**Creates Potential for Accelerated Growth and Organizational Synergies**

The combined company brings together Keryx, a commercial organization, with Akebia, a leader in the development of HIF-PHI therapeutics for patients with kidney disease. The combined company will have an established renal development, manufacturing and commercial organization, and plans to leverage its leadership's extensive expertise in the commercial renal market with the goal of maximizing sales of Auryxia while driving launch momentum for vadadustat in the United States, subject to its regulatory approval. Keryx's established U.S. sales and marketing organization and its medical affairs team have built strong awareness within the nephrology community to address the needs of patients with CKD, and will drive the launch preparation and execution for vadadustat in the United States, subject to its regulatory approval.

**Combines Experienced Renal Management Teams**

The combined company will be led by a management team with a long track record of success developing, launching and commercializing products for patients with kidney disease. John P. Butler, who will lead the combined company as Chief Executive Officer, has nearly two decades of executive experience in the commercial renal therapeutic field, including as the leader of Genzyme Corporation's renal business, which grew from $150 million in revenue to over $1 billion under his leadership.

**Strengthens Financial Profile**

The combined company will have $453 million in cash on its balance sheet (unaudited pro forma cash balance as of March 31, 2018), which, along with the expected cost synergies of greater than $250 million to be realized five years following closing, and the potential for increasing revenues from Auryxia, are expected to provide the combined company with significant financial strength and flexibility to enable continued growth.

**Combined Company Board of Directors**

The Board of Directors of the combined company is expected to consist of nine directors, four of whom are Akebia directors and four of whom are

Keryx directors. Keryx will appoint the Chairperson of the Board of Directors of the combined company.[1]

26.     However, the Merger Consideration is inadequate in light of Keryx's recent financial performance and growth prospects.

27.     Indeed, on May 8, 2018, the Company announced its First Quarter 2018 Financial Results.  Notably, net U.S. Auryxia product sales were $20.6 million in the first quarter of 2018, as compared to $10.5 million in the same quarter in 2017, **representing growth of 96 percent**.[2]

28.     Scott Holmes, the Company's Chief Financial Officer, commented on U.S. Auryxia success:

> Today, we reported 34,600 prescriptions in the first quarter, which translated into $20.6 million in Auryxia sales. It's important to note that all other medicines in the hyperphosphatemia market declined in absolute prescription count in the first quarter, while Auryxia continued to grow.[3]

29.     As a result of U.S. Auryxia's success, total revenues for the quarter ended March 31, 2018 were approximately $21.7 million, compared with $11.8 million during the same period in 2017.

30.     On August 8, 2018, the Company announced its Second Quarter 2018 Financial Results, which further illustrated that Auryxia was poised for considerable growth.  Net U.S.

---

[1]   Keryx Biopharmaceuticals, Inc., Current Report (Form 8-K), at Exhibit 99.3 (Joint Press Release, dated June 28, 2018) (June 28, 2018).

[2]   Keryx Biopharmaceuticals Announces First Quarter 2018 Financial Results, Seeking Alpha (May 8, 2018), *available at* https://seekingalpha.com/pr/17159239-keryx-biopharmaceuticals-announces-first-quarter-2018-financial-results.

[3]   Keryx Biopharmaceuticals' (KERX) CEO Jodie Morrison on Q1 2018 Results - Earnings Call Transcript, Seeking Alpha (May 10, 2018), *available at* https://seekingalpha.com/article/4172233-keryx-biopharmaceuticals-kerx-ceo-jodie-morrison-q1-2018-results-earnings-call-transcript?part=single.

Auryxia product sales were $24.1 million in the second quarter of 2018, as compared to $14.1 million in the same quarter in 2017, **representing growth of 71 percent**.[4]

31.     In addition, the Company also realized a doubling of Auryxia prescription demand as compared to the second quarter of 2017, which resulted in a full point gain in market share in the quarter when compared to the first quarter of 2018.[5]

32.     Clearly, Auryxia and, as a result, Keryx is poised for continued growth.  As a result, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision concerning whether to vote their shares in favor of the Proposed Transaction.

**II.      The Materially Incomplete and Misleading Proxy**

33.     On October 1, 2018, the Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Keryx shareholders.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

---

[4]     Keryx Biopharmaceuticals Announces Second Quarter 2018 Financial Results, Seeking Alpha (Aug. 8, 2018), *available at* https://seekingalpha.com/pr/17239359-keryx-biopharmaceuticals-announces-second-quarter-2018-financial-results.

[5]     Keryx Biopharmaceuticals, Inc. (KERX) CEO Jodie Morrison on Q2 2018 Results - Earnings Call Transcript, Seeking Alpha (Aug. 8, 2018), *available at* https://seekingalpha.com/article/4196346-keryx-biopharmaceuticals-inc-kerx-ceo-jodie-morrison-q2-2018-results-earnings-call-transcript?part=single.

34.     First, while the Proxy fails to provide sufficient information regarding financial projections for the Company.

35.     Specifically, the Proxy provides several non-GAAP financial metrics for Keryx, including EBIT and Unlevered Free Cash Flow, but fails to disclose the line-item projections for the specific metrics, adjustments, and/or inputs that are used to calculate these Non-GAAP financial measures or provide a reconciliation of the Non-GAAP measures to their most directly comparable GAAP financial measure, such as Net Income.  *See* Proxy at 87.

36.     The failure to disclose the specific metrics, adjustments, and/or inputs that are used to calculate each Non-GAAP metric renders the Proxy materially incomplete and misleading because Non-GAAP numbers are inherently misleading.  To clarify, in stark contrast to GAAP metrics, Non-GAAP figures are not standardized and, consequently, can be manipulated and easily taken out of context.

37.     For example, the Proxy defines EBIT as "gross profit less operating expenses," but fails to disclose Keryx's projected operating expenses.  *Id.*

38.     Likewise, the Proxy defines Unlevered Free Cash Flow as "EBIT less income tax expense, plus depreciation and amortization, less changes in working capital, less capital expenditures," but fails to disclose: (i) income tax expense; (ii) depreciation and amortization; (iii) changes in working capital; and (iv) capital expenditures.  *Id*.

39.     Numerous courts have championed the importance of management based financial projections because a company's management has unique insight into their firm's future that the market does not.  Stockholders cannot hope to replicate management's inside view of the Company's prospects.  The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making.

40.     Omission of the above-referenced projections renders the Proxy materially incomplete and misleading.  If a proxy statement discloses financial projections and valuation information, such projections **must be complete and accurate**.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—**but it may not choose half-truths**.

41.     The Proxy describes MTS Securities' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of MTS Securities' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Keryx's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on MTS Securities' fairness opinion in determining whether to vote their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Keryx's common shareholders.

42.     With respect to MTS Securities' *Discounted Cash Flow Analysis* for Keryx, the Proxy fails to disclose the following key assumptions and inputs for the analysis: (i) the inputs and assumptions underlying the selection of the terminal exit revenue multiples of 2.0x to 5.0x; (ii) the actual terminal enterprise value at December 31, 2028 utilized in the analysis; and (iii) the inputs and assumptions underlying the selection of the weighted average cost of capital range of 11% to 15%.  *See* Proxy at 94.

43.     With respect to MTS Securities' *Discounted Cash Flow Analysis* for Akebia, the Proxy fails to disclose the following key assumptions and inputs for the analysis: (i) the inputs and assumptions underlying the selection of the terminal exit revenue multiples of 4.0x to 6.0x; (ii) the

actual terminal enterprise value at December 31, 2025 utilized in the analysis; and (iii) the inputs and assumptions underlying the selection of the weighted average cost of capital range of 13% to 17%. *See* Proxy at 96.

44.     Furthermore, with respect to MTS Securities' *Discounted Cash Flow Analysis – Keryx Management Adjusted Akebia Projections*, the Proxy fails to disclose the following key assumptions and inputs for the analysis: (i) the expected unlevered free cash flows that Akebia will generate during the period beginning July 1, 2018 through on December 31, **2028**;  and (ii) the actual terminal enterprise value at December 31, 2028 utilized in the analysis.  Indeed, pages 88 through 89 of the Proxy only disclose Keryx Management **Adjusted** Akebia Projections for unlevered free cash flows for the years 2018 through **2025**.   However, the Proxy does disclose Keryx Management Akebia Projections—**non-Adjusted**—for unlevered free cash flows for the years 2018 through **2028**.  *See* Proxy at 87-88.  Consequently, Keryx shareholders are misled as to which set of unlevered free cash flow projections MTS Securities actually utilized in light of the title of the analysis (*i.e., Keryx **Management Adjusted** Akebia Projections*) and the corresponding failure to disclose Keryx Management Adjusted Akebia Projections for the years 2018 through 2028.

45.     These key inputs are material to Keryx's common shareholders, and the omission of such information renders the summaries of MTS Securities' *Discounted Cash Flow Analysis* for Keryx and Akebia incomplete and misleading.  As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, "there is [] an element of subjectivity present in the choice and application of these [valuation] methods" and that the banker's key choices can have a substantial "effect the outcome of a valuation."  Steven M. Davidoff, *Fairness*

*Opinions*, 55 Am. U.L. Rev. 1557, 1573-74 (2006).  Such choices include "the appropriate

discount rate, and the terminal value…"  *Id.*  With respect to a discounted cash flow analysis,

Professor Davidoff explains:

> **There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, Keryx shareholders

cannot evaluate for themselves the reliability of the DCF analyses, make a meaningful

determination of whether the implied value reference ranges reflect the true value of the Company

and Akebia or, instead, as the result of MTS Securities' unreasonable judgment, and make an

informed decision regarding whether to vote their shares in the Proposed Transaction

46.    With respect to MTS Securities' *Public Trading Comparable Companies Analysis*

for Keryx, the Proxy fails to disclose the individual multiples MTS Securities calculated for each

of the companies included in the analysis.  *See* Proxy at 94-95.  A fair summary of the *Public*

*Trading Comparable Companies Analysis* requires the disclosure of the individual multiples for

each company utilized; providing the low and high multiples that a banker applied to render

Keryx's implied share value ranges is insufficient, as shareholders are unable to assess whether

the banker applied the appropriate multiples, or, instead, applied unreasonably low multiples in

order to drive down the implied valuation of the Company.  Accordingly, the omission of the

individual multiples renders the summary of these analyses set forth on pages 94 through 95 of the Proxy materially incomplete and misleading.  In addition, the Proxy also fails to disclose adjustments made to Evercore's *Public Trading Comparable Companies Analysis* for Keryx, specifically: (i) net debt; (ii) preferred stock; and (iii) minority interest.  The failure to disclose these adjustments is, likewise, renders the summary of the analysis materially incomplete and misleading.

47.     Similarly, with respect to MTS Securities' *Public Trading Comparable Companies Analysis* for Akebia, the Proxy fails to disclose the individual multiples MTS Securities calculated for each of the companies included in the analysis.  *See* Proxy at 97-98.  For the same reasons discussed above, the omission of the individual multiples renders the summary of the analysis and the Akebia implied share value ranges misleading.

48.     Finally, the Proxy also fails to disclose or misstate material information concerning the Board's potential conflict of interest.

49.     Specifically, the Proxy states that during the negotiation of the Merger Agreement, the parties negotiated the composition of the combined company's board of directors, which ultimately resulted in an agreed upon term in an amendment to the Merger Agreement[6] that stipulates "the Combined Board will consist of ten (10) directors, **including [ ● ], [ ● ], [ ● ], [ ● ], and [ ● ], who are current members of the Keryx Board** designated by the Keryx Board and were reasonably acceptable to Akebia."  Proxy at 121 (emphasis added).

---

[6]   The initial iteration of the Merger Agreement stated that four representatives from the Keryx Board would be directors of the Combined Board.  However, pursuant to the First Amendment to the Merger Agreement, dated October 1, 2018, five representatives from the Keryx Board will be directors of the Combined Board.

50.     However, the *Background of the Merger*, *The Combined Company Board and Management After the Merger*, and *Interests of Keryx's Directors and Executive Officers in the Merger* sections of the Proxy fails to disclose if any negotiations took place concerning the specific individuals who would serve on the combined company's board of directors (the "Combined Board").  Such information is material to Keryx shareholders so that they may understand the conflicts of interest facing the Board, particularly because: (i) the Board is only composed of 7 individuals and, therefore, a majority of the Board stand to be appointed to the Combined Board; and (ii) the Board organized a **second** special committee (the "Keryx Special Committee") of allegedly independent directors to help avoid potential conflicts of interest that the Board and the initial special committee faced because of certain individual's relationships with Akebia and Baupost.  *See* Proxy at 70 ("The Keryx Board discussed that, given the potential role of Baupost and its consultant in the contemplated transaction, as well the relationship Mr. Rogers had with the Chairperson of the Akebia Board, it would be prudent to reconstitute the Keryx Special Committee to alleviate any perceived conflicts of interest.").

51.     If such negotiations took place, the particular individuals who will be appointed to the Combined Board and the timing and nature of such discussions must be disclosed to Keryx shareholders.  Indeed, the timing and nature of post-close employment provides key insight concerning motivations that would prevent fiduciaries from acting solely in the best interests of a company's shareholders.  If the Board or, more importantly, the Keryx Special Committee negotiated for their own interests ahead of shareholders compensation, shareholders would certainly find such information material, particularly in light of the fact that the Board only consists of **7 individuals** and, consequently, **5** (*i.e.,* a majority of the Board) individuals stand to be appointed to the Combined Board.  Accordingly, if such negotiations took place, the failure to

disclose identities of those individuals and the timing and nature of the negotiations renders the statements in the *Background of the Merger*, *The Combined Company Board and Management After the Merger*, and *Interests of Keryx's Directors and Executive Officers in the Merger* sections of the Proxy materially incomplete and misleading.

52.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

53.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

54.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

55.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and

in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

56.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

57.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Keryx; (ii) the valuation analyses conducted by MTS Securities in support of its fairness opinion; and (iii) the Board's potential conflict of interest.

58.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

59.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that MTS Securities reviewed and discussed their

financial analyses with the Board, and further states that the Board considered the financial analyses provided by MTS Securities, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review MTS Securities' analyses in connection with their receipt of the fairness opinions, question MTS Securities as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

60.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

61.     Keryx is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

62.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

63.     Plaintiff incorporate each and every allegation set forth above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Keryx within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Keryx, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

67.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the upcoming shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 15, 2018

                                                    **COOCH AND TAYLOR, P.A.**

                                                    */s/ Blake A. Bennett*
                                                    Blake A. Bennett (#5133)
                                                    The Brandywine Building
**OF COUNSEL**                                      1000 West Street, 10th Floor
**MONTEVERDE & ASSOCIATES PC**                      Wilmington, DE 19801
Juan E. Monteverde                                  Tel.: (302) 984-3800
The Empire State Building                           Email:  bbennett@coochtaylor.com
350 Fifth Avenue, Suite 4405                        *Attorneys for Plaintiff*
New York, NY 10118
Tel.: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
*Attorneys for Plaintiff*