## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE KERYX BIOPHARMACEUTICALS, INC. | Lead Case No. 18-cv-01589-CFC<br><br>CLASS ACTION<br><br>CONSOLIDATED SHAREHOLDER LITIGATION |

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs John Andreula and Abraham Kiswani ("Plaintiffs"), on behalf of themselves and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through their counsel, except as to those allegations pertaining to Plaintiffs, which are alleged upon personal belief, allege the following for their Consolidated Amended Class Action Complaint:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiffs on behalf of themselves and all other public stockholders of Keryx Biopharmaceuticals, Inc. ("Keryx" or the "Company") against Keryx and the members of Keryx's Board of Directors (the "Board" or the "Individual Defendants," and together with Keryx, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Keryx by Akebia Therapeutics, Inc. ("Akebia") through Akebia's wholly owned subsidiary Alpha Therapeutics Merger Sub, Inc. ("Merger Sub") (the "Merger").

2.      On June 28, 2018, Keryx and Akebia announced the Agreement and Plan of Merger (as amended on October 1, 2018, the "Merger Agreement") to combine the two biopharmaceutical companies, both of which focus on developing and providing innovative therapies and medicines to patients with kidney disease.[1]  Under the terms of the Merger Agreement, each issued and outstanding share of Keryx common stock would be converted into the right to receive 0.37433 shares of Akebia common stock (the "Merger Consideration"). Although Akebia's lead product, vadadustat, is in Phase 3 clinical trials and not yet marketed, Keryx stockholders would only own 50.6% of the combined company, with Akebia stockholders owning 49.4%.

3.      The Merger is the product of a seriously flawed process designed to ensure the sale of Keryx to Akebia on terms preferential to Defendants and Keryx's largest stockholder and holder of convertible notes (the "Convertible Notes"),[2] The Baupost Group, L.L.C. ("Baupost"), while delivering inadequate consideration to Plaintiffs and the other public stockholders of the Company.   Indeed, during the sixty days preceding the announcement of the Merger, Keryx stock traded as high as $5.98 per share, yet on the date of the Stockholder Vote (defined below) on the Merger the value of the Merger Consideration was only ***$3.43 per share***.  As of May 31, 2019, the Merger Consideration was worth a mere ***$1.47 per share***.  In light of the misleading

---

[1] At the time of the announcement of the Merger, Keryx had one marketed product called Auryxia (ferric citrate), an orally available, absorbable iron-based tablet approved by the U.S. Food and Drug Administration ("FDA") for two indications: (1) the control of serum phosphorus levels in patients with chronic kidney disease ("CKD") on dialysis; and (2) the treatment of iron deficiency anemia in adults with CKD not on dialysis.   Akebia had no marketed products, but its lead product candidate, vadadustat, is designed to provide therapies to patients with kidney disease utilizing hypoxia-inducible factor biology.

[2] According to the Proxy (defined below), Baupost was the holder of approximately $164.75 million of Convertible Notes.  Proxy at 68.

nature of the projected value of Akebia presented to Keryx stockholders (described below), the exchange ratio should have been much higher.

4.     The Merger was driven by Baupost's self-interest.  In December 2017, John P. Butler ("Butler"), Akebia's President and Chief Executive Officer ("CEO") – and a former Baupost designee on the Keryx Board – contacted Keryx regarding a potential transaction. Mutual due diligence ensued.  In February 2018 a Research and Development Committee of the Keryx Board (the "R&D Committee"), charged with reviewing Akebia's vadadustat clinical program, recommended the Board discontinue negotiations with Akebia.  Thereafter, Baupost contacted Akebia directly and conducted its own due diligence of Akebia.  Following the abrupt resignation of Keryx's then-President and CEO Gregory P. Madison ("Madison") on April 27, 2018, Baupost pressured the Board to re-engage with Akebia.  Before the ink dried on Madison's resignation letter, the Board authorized Keryx's newly appointed Interim CEO, defendant Jodie P. Morrison ("Morrison"), to contact Butler about reengaging in discussions regarding a potential transaction with Keryx.

5.     Thereafter, Baupost used its position and leverage to secure, in addition to its pro rata share of the combined company and conversion of its Convertible Notes into equity, a transaction bonus worth an additional $20 million (the "Transaction Bonus").[3]  The Transaction Bonus, which diverted consideration away from Keryx's other public stockholders, was provided to Baupost to secure its support for the Merger in the form of a voting agreement in which Baupost agreed to vote its Keryx shares in favor of the Merger.

---

[3] The Transaction Bonus was delivered in the form of four million additional Keryx shares (the "Additional Shares") issued to Baupost in connection with the conversion under a Notes Conversion Agreement, dated as of June 28, 2018, by and among Keryx, Baupost and Akebia.

6.     The ease in which Baupost was able to secure the Transaction Bonus is not surprising given Baupost's entanglements with both Keryx and Akebia board members. Specifically, (1) defendant Mark J. Enyedy ("Enyedy") had been appointed to the Board as an independent director at the request of Baupost, (2) Butler previously served as an independent member of the Board at the request of Baupost from December 2015 to September 2017, including as Chairman of the Board from May 2016 to September 2017, and (3) Ronald C. Renaud, Jr., a member of the Akebia board, served as CEO of Translate Bio, Inc., of which Baupost is an investor.

7.     Keryx's insiders, including defendant Morrison, had a strong financial interest in ensuring the Merger went through, as they stood to earn a substantial payout from accelerated vesting of equity awards, additional cash awards under preexisting employment agreements and retention agreements negotiated during the process leading to the Merger, as well as entitlement to severance benefits under preexisting severance arrangements.

8.     On October 30, 2018, to secure stockholder support for the unfair Merger, Keryx filed a materially false and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC.

9.     The Proxy contained numerous material misleading statements or omissions in an attempt to secure Keryx stockholder approval of the Merger.  Most importantly, the Proxy misled the Company's stockholders with respect to Keryx management's projections for Akebia, the valuation analyses performed by Keryx's financial advisor MTS Securities, LLC ("MTS") that relied upon these projections, and, ultimately, the value of Akebia.  Keryx management's projections for Akebia (and the valuation analyses in which they were utilized) are materially false and misleading for two reasons.

- 4 -

10.     First, Keryx management created two widely disparate sets of financial projections for Akebia and held each out as "reflect[ing] the best currently available estimates and judgments of Keryx management" (Proxy at 96), which misled Keryx stockholders as to the true value of Akebia.   These projections were: (1) a set based on Keryx management's assumptions for Akebia's business (the "Keryx Management Akebia Projections"); and (2) a set based on information provided by Akebia management for Akebia's business, to which Keryx management applied its own assumptions (the "Keryx Management Adjusted Akebia Projections").   The projections revealed two drastically different pictures of Akebia's future prospects.   For example, while the Keryx Management Akebia Projections projected 2025 Akebia Revenue of $284 million, the Keryx Management Adjusted Akebia Projections projected 2025 Akebia Revenue of $915 million.   *Id.* at 93-94.   Yet, according to the Proxy, each of Keryx management's projection sets for Akebia "was reasonably prepared in good faith" and "reflected the best currently available estimates and judgments of Keryx management" (*id.* at 96), which was impossible given the immense discrepancy in the projection sets.   As such, these conflicting statements were false and/or misleading.

11.     Second, the Keryx Management Adjusted Akebia Projections were unreasonable and disclosed in the Proxy in order to make the Merger Consideration appear more favorable to Keryx stockholders.   Keryx management's artificially inflated Keryx Management Adjusted Akebia Projections failed to account for forthcoming delays to Akebia's development timeline for vadadustat.   Defendants were aware of this impending setback to Akebia prior to entering into the Merger, and Keryx management should have *downwardly* revised its Adjusted Akebia Projections accordingly.   Even Akebia's management revised its own projections based on this news.   Indeed, the Keryx Management Adjusted Projections for Akebia were *even more*

*optimistic* than Akebia management's projections for Akebia's business.

12.     The Defendants knew that the best available estimates of Akebia's future financial performance must contemplate a delayed developmental timeline for vadadustat, and that the Keryx Management Adjusted Akebia Projections provided in the Proxy did not reflect this timeline.   Therefore, both the Keryx Management Adjusted Akebia Projections themselves and their supporting statements were material misrepresentations and/or omissions, which misled Keryx stockholders into believing Akebia's intrinsic value in the Merger was higher than it actually was.

13.     Moreover, the statements in the Proxy that the Board "determined that the Merger Agreement and the Merger are advisable, fair to, and in the best interests of Keryx and its shareholders" and that the "Receipt of Fairness Opinion of MTS Securities" was a factor relied upon by the Board "[i]n reaching its decision to approve the Merger Agreement and recommend the adoption of the Merger Agreement to shareholders" are false and misleading.   *Id.* at cover-page, 85; *see also id.* at A-8.   MTS was in part retained to render an opinion as to the fairness of the Merger to Keryx stockholders from a financial perspective ("Fairness Opinion")[4].   The Individual Defendants directed MTS to use the Keryx Management Adjusted Akebia Projections as a basis for the financial analyses underlying its Fairness Opinion.   Defendants then promoted MTS' Fairness Opinion to present a rosy view of Akebia's intrinsic value and to garner stockholder support for the Merger despite knowing that MTS' Fairness Opinion was fundamentally flawed given its reliance upon the artificially inflated Keryx Management Adjusted Akebia Projections.   Thus, statements in the Proxy regarding the Defendants' good-faith belief in the fairness of the Merger to Keryx stockholders and good-faith reliance on MTS'

---

[4] A summary of the underlying financial analyses performed by MTS and presented to the Keryx Board in connection with its Fairness Opinion appears on pages 98-106 of the Proxy.

Fairness Opinion are false and misleading.

14.     Finally, the Proxy failed to provide Keryx stockholders with all material information about the negotiations resulting in the $20 million windfall for Baupost in the form of the Additional Shares.

15.     The special meeting of Keryx stockholders to vote on the Merger was held on December 11, 2018 (the "Stockholder Vote").  A majority of Keryx's stockholders voted to approve the Merger, and the Merger closed on December 12, 2018.  The materially false and misleading Proxy was an essential link in the consummation of the Merger, as the Stockholder Vote and resulting Merger could not have occurred without the dissemination of the Proxy.

16.     For these reasons as set forth in detail herein, Plaintiffs assert claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiffs seek to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

18.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the Mergers and wrongs complained of herein occurred in this District.

## THE PARTIES

20.     Plaintiff John Andreula was at all times relevant hereto a continuous stockholder of Keryx.  Mr. Andreula was designated as Lead Plaintiff in this action by order of this Court dated April 2, 2019 (Dkt. No. 13).

21.     Plaintiff Abraham Kiswani was at all times relevant hereto a continuous stockholder of Keryx.  Mr. Kiswani was designated as Lead Plaintiff in this action by order of this Court dated April 2, 2019 (Dkt. No. 13).

22.     Defendant Keryx was a Delaware corporation and maintained its principal executive offices at One Marina Park Drive, 12th Floor, Boston, Massachusetts 02210.  Prior to the Merger, Keryx was a commercial stage biopharmaceutical company focused on the development and commercialization of medicines for people with kidney disease.

23.     Defendant Kevin J. Cameron ("Cameron") served as a director of the Company from April 2007 through the completion of the Merger.

24.     Defendant Enyedy served as a director of the Company from September 2017 through the completion of the Merger and currently serves on the Akebia board of directors.

25.     Defendant Steven C. Gilman ("Gilman") served as a director of the Company from March 2016 through the completion of the Merger and currently serves on the Akebia board of directors.

26.     Defendant Michael T. Heffernan ("Heffernan") served as a director of the Company from June 2016 through the completion of the Merger and currently serves on the Akebia board of directors.

27.     Defendant Morrison served as Keryx's Interim CEO from April 30, 2018 and a director of the Company from June 2016 through the completion of the Merger and currently

serves on the Akebia board of directors.

28.     Defendant Daniel P. Regan ("Regan") served as a director of the Company from October 2013 through the completion of the Merger.

29.     Defendant Michael Rogers ("Rogers") served as a director of the Company from March 2016 through the completion of the Merger and currently serves on the Akebia board of directors.

30.     Defendants Cameron, Enyedy, Gilman, Heffernan, Morrison, Regan and Rogers are referred to herein as the "Board" or the "Individual Defendants" and collectively with Keryx, as the "Defendants."

## OTHER RELEVANT ENTITIES

31.     Akebia is a biopharmaceutical company focused on the development and commercialization of therapeutics for patients with kidney disease.  Akebia's lead investigational product candidate, vadadustat, is an oral therapy in Phase 3 development for two indications: anemia due to CKD in adult patients with CKD on dialysis and anemia due to CKD in adult patients with CKD not on dialysis.  Akebia is a Delaware corporation with its principal executive offices located at 245 First Street, Cambridge, Massachusetts 02142.  Akebia's common stock is traded on the NASDAQ Global Market under the ticker symbol "AKBA."

32.     Merger Sub was a Delaware corporation and a direct wholly owned subsidiary of Akebia.

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that owned Keryx common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families,

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34.     Plaintiffs' claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

35.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in the Class.  As of October 22, 2018, there were 120,375,926 shares of Company common stock outstanding.  All members of the Class may be identified from records maintained by Keryx or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

36.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

•       Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

•       Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

•       Whether Plaintiffs and the other members of the Class have been damaged and the proper measure of damages.

37.     Plaintiffs will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiffs seek to represent. Plaintiffs have retained competent counsel experienced in litigation of this nature.

38.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

39.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.


## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

40.      Keryx was a commercial stage biopharmaceutical company focused on bringing innovative medicines to people with kidney disease.  The Company's marketed product, Auryxia (ferric citrate) tablets, is an orally available, absorbable iron-based medicine.  In September 2014, Auryxia was approved by the FDA for the control of serum phosphorus levels in patients with CKD on dialysis.  In November 2017, Auryxia was approved by the FDA for the treatment of iron deficiency anemia in adults with CKD not on dialysis.  Ferric citrate is also approved in Japan under the trade name Riona and marketed by the Company's Japanese partner, Japan Tobacco, Inc. and its subsidiary Torii Pharmaceutical Co., Ltd., and in Europe as Fexeric.

41.      Keryx has generated positive financial results from sales of Auryxia.  For example, on February 7, 2018, Keryx announced its fourth quarter and full year 2017 financial results.  Full year 2017 net U.S. Auryxia product sales more than doubled in 2017 to $55.5 million, compared to $27.2 million for the full year 2016.  For the quarter, net U.S. product sales were $17.3 million, compared to $8.2 million in the fourth quarter 2016.  Total revenues for full year 2017 were $60.6 million, compared to $32.0 million in 2016.  For the quarter, total revenues were $18.7 million, compared with $9.5 million for the fourth quarter of 2016.  Approximately

30,400 Auryxia prescriptions were reported in the fourth quarter of 2017 compared to approximately 8,700 prescriptions in the fourth quarter of 2016.  Scott Holmes ("Holmes"), Keryx's Chief Financial Officer ("CFO"), commented on the strong financial results, stating:

> The strong prescription demand growth generated in the fourth quarter, coupled with the stabilization of the gross-to-net adjustment, led to $17.3 million of net U.S. Auryxia product sales in the fourth quarter of 2017. . . . As we enter 2018, we believe we will continue to drive Auryxia growth as a chronic kidney disease treatment for both hyperphosphatemia in the dialysis setting, as well as iron deficiency anemia in the non-dialysis setting.

On the February 7, 2018 earnings call, then-CEO Madison highlighted the Company's future outlook, stating:

> Our vision is to build a leading renal business and we believe we have an outstanding foundational medicine in Auryxia.  In 2018, we're focused on driving growth in Auryxia in both the dialysis and the pre-dialysis setting.  We'll build on our recent accomplishments as we seek to bring Auryxia to more patients who can benefit from its two indications.

42.    The positive news for Keryx stockholders continued.  On May 10, 2018, Keryx announced its successful first quarter 2018 financial results due to sales of Auryxia.  The Company reported a 96% increase in net U.S. Auryxia product sales of $20.6 million compared to $10.5 million in the first quarter of 2017.  Approximately 34,600 Auryxia prescriptions were reported in the first quarter of 2018 compared to approximately 15,800 prescriptions in the first quarter of 2017.  During the May 10, 2018 earnings call, Holmes commented on the quarter's successful results, stating, "First and foremost, we are making good commercial progress with 118% increase in prescription volume versus the first quarter of last year and a 96% increase in Auryxia net sales."

**The Process Leading Up to the Merger**

43.    In October 2015, Keryx raised $125 million through the private placement of convertible senior notes, due 2020, with funds managed by Baupost.  In connection with the

financing, Baupost received the right to appoint a director to the Board.  On December 10, 2015, Keryx announced the appointment of Butler, Akebia's President and CEO, to the Board.  Butler remained Baupost's designee on the Board, including serving as Chairman of the Board beginning in May 2016, until the Company announced his resignation on September 13, 2017.

44.     On December 8, 2017, Butler contacted Keryx's then-President and CEO Madison to discuss a potential transaction between Akebia and Keryx.  The parties entered into a reciprocal confidentiality agreement and conducted initial due diligence.  In connection with its due diligence, Keryx formed a R&D Committee which was charged with overseeing and reviewing the regulatory and clinical due diligence undertakings on Akebia with respect to the potential transaction with Akebia.

45.     In early February 2018, members of Keryx management and its outside consultants met with the R&D Committee to discuss Akebia's vadadustat clinical program, as well as the timing and investment required to complete Akebia's vadadustat clinical program.  At a February 9, 2018 R&D Committee meeting, the R&D Committee determined to recommend that the Keryx Board discontinue pursuing a transaction with Akebia and reported its recommendation to the members of the Keryx Board's special committee (the "Special Committee").

46.     On February 12, 2018, the R&D Committee reported to the Keryx Board the results of due diligence and certain uncertainties inherent in development stage companies.  The Board determined, based on the report and recommendation of the R&D Committee, to cease discussions with Akebia regarding a potential transaction at that time.  On February 16, 2018, Madison informed Butler that Keryx was not interested in pursuing a transaction with Akebia at that time.

47.     In March 2018, representatives of Baupost communicated to Akebia management that Baupost was interested in conducting diligence on Akebia and its clinical program.  Baupost and Akebia entered into a confidentiality agreement with the consent of the Akebia board, and thereafter, Akebia shared certain information with Baupost and Baupost's consultants, and engaged in discussions with Baupost regarding diligence over the next several weeks.

48.     On April 27, 2018, Madison abruptly resigned as the President, CEO and a director of the Company, effective immediately, with no explanation.

49.     With Madison out of the picture, Baupost pressured the Board to reconsider a merger with Akebia.  At an April 27, 2018 Board meeting, representatives of Baupost provided Keryx with access to a consultant who had conducted due diligence on Akebia, including on its clinical trial and research and development programs.  The Board determined that defendant Morrison, Keryx's newly-appointed Interim CEO, should contact Butler to inquire as to whether Akebia would be interested in reengaging in discussions regarding a potential transaction with Keryx.  Defendant Morrison contacted Butler on April 29, 2018 and the parties reengaged in exploring a potential transaction.

50.     On May 11, 2018, Akebia management provided Keryx with certain unaudited prospective financial information of Akebia on a standalone basis.  Keryx management, along with MTS, reviewed these projections and applied certain assumptions and adjustments, to arrive at the Keryx Management Adjusted Akebia Projections.

51.     On May 24, 2018, Akebia sent Keryx a non-binding offer letter proposing a merger that would result in the shareholders of each company owning 50% of the combined company.  The offer assumed, among other things, the full conversion of the Convertible Notes held by Baupost and that Baupost would provide a support agreement in favor of the transaction.

52.     At a May 29, 2018 Special Committee meeting, the Special Committee discussed Keryx's May 24, 2018 non-binding offer letter, Keryx's standalone prospects, the Keryx Management Adjusted Akebia Projections, the Keryx Management Akebia Projections and certain preliminary financial information prepared by MTS.  Keryx management reported to the Special Committee on the assumptions underlying the Keryx Management Adjusted Akebia Projections, which projections Keryx management had directed MTS to use in connection with its financial analyses.  The Special Committee determined to continue discussions with Akebia for a merger of equals.

53.     On June 7, 2018, members of the Akebia and Keryx management teams met with Baupost to discuss the proposed transaction and whether Baupost would be willing to convert the Convertible Notes in connection with, and would otherwise be supportive of, a merger of the two companies.  Baupost indicated that it would consider converting some or all of the Convertible Notes as part of the transaction, but that it would request consideration for agreeing to convert the Convertible Notes prior to the closing of the transaction, in the form of equity of the combined company.

54.     Thereafter, on June 10, 2018, the Special Committee met and MTS presented financial information regarding a range of proposed valuations for the early conversion by Baupost of the Convertible Notes.  After discussion, the Special Committee authorized Keryx management and MTS to discuss the range of proposed valuations with representatives from Baupost.

55.     On June 11, 2018, defendant Morrison and other members of Keryx management presented to Baupost a range of proposed valuations for the early conversion by Baupost of the Convertible Notes.  Baupost indicated that the range at which Baupost was valuing an early

conversion was considerably higher than the range of proposed valuations provided by Keryx, but agreed to take Keryx's proposal under consideration. The Proxy fails to disclose the range of values discussed. Baupost also reiterated that it would consider accepting consideration in the form of equity of the combined company.

56. Later on June 11, 2018 at a Special Committee meeting, defendant Morrison reported on the call with Baupost, including the difference in valuation for the conversion posited by each of Baupost and Keryx. Following discussion, including discussion of the range of proposed valuations prepared by Keryx management and MTS, the Special Committee decided that Morrison should communicate Keryx's view of the value of the conversion to Baupost, which Morrison relayed later that day. The Proxy fails to disclose the updated range of the value of the conversion relayed to Baupost. The Baupost representative informed defendant Morrison that Keryx's valuation was unacceptable and that Baupost's valuation of the conversion was higher.

57. On June 15, 2018, Butler informed defendant Morrison that Akebia planned to update its guidance on the timing of top-line results for the vadadustat clinical trial programs. Although the Proxy reveals that only a day earlier the Akebia board had advised Akebia management to update its own projections to accurately reflect, among other things, "timing for clinical trial completion and commercial launch" of vadadustat (Proxy at 79), Keryx management failed to update its own projections for Akebia based on Akebia management's up-to-date guidance. Shortly thereafter, Butler would publicly reveal that Akebia was delaying the timeline for its Phase 3 vadadustat trials, with top-line data expected in mid-2020 rather than 2019. *Compare* Akebia Therapeutics and Keryx Biopharmaceuticals Joint Corporate Conference Call Transcript dated June 28, 2018, at 8 ("We now expect topline data by mid-2020 subject to

MACE approval."),[5] *with* May 9, 2018 Akebia Press Release, "Akebia Therapeutics Announces First Quarter 2018 Financial Results" ("with top-line results [for Phase 3 studies] anticipated in 2019, subject to the accrual of major adverse cardiovascular events, or MACE").[6]

58.     At a June 17, 2018 Board meeting, Morrison reported on the status of the negotiations with Baupost and MTS provided an overview of the financial information regarding the range of proposed valuations for an early conversion of the Convertible Notes.  The Proxy fails to disclose the overview of the financial information regarding the range of proposed valuations for an early conversion of the Convertible Notes provided to the Board.

59.     Between June 18, 2018 and June 23, 2018, Akebia's Chief Business Officer, representatives of Keryx management and MTS spoke with Baupost representatives on the terms of the conversion of the Convertible Notes.  Following these discussions, Baupost proposed to Keryx that Baupost should receive appropriate consideration, proposed in the form of the Additional Shares (which represented approximately $20.0 million in value at that time).

60.     On June 20, 2018, the Akebia board met and in consultation with Akebia management, determined that, in order to cause Baupost and Keryx to convert the Convertible Notes and enter into a support agreement concerning the Merger, the most recent Baupost proposal would be acceptable to Akebia, resulting in the allocation of 4,000,000 Keryx shares to Baupost.

61.     Thereafter, the parties finalized the remaining terms of the Merger Agreement. On June 27, 2018 MTS presented its Fairness Opinion based, in part, on the Keryx Management Adjusted Akebia Projections.  The Board, Special Committee and Keryx management knew that

---

[5] Available at:
https://www.sec.gov/Archives/edgar/data/1114220/000119312518207810/d858645d425.htm
[6] Available at: https://www.sec.gov/Archives/edgar/data/1517022/000156459018012395/akba-ex991_348.htm

the Keryx Management Adjusted Akebia Projections, which relied upon the obsolete timing of top-line results for the vadadustat clinical trial programs, were unreasonable. Yet, the Board and its Special Committee deliberately turned a blind eye and accepted MTS' flawed Fairness Opinion. The Board, upon the unanimous recommendation of the Special Committee, approved the Merger Agreement. The parties executed the Merger Agreement the next day.

62.    The Merger Consideration of 0.37433 shares of Akebia common stock per share of Keryx common stock is unfair to the Company's stockholders. For example, on June 27, 2018, the day MTS rendered its Fairness Opinion, the Merger Consideration represented just $3.89 per Keryx share, a significant *discount* to Keryx's same-day trading price of $4.48 per share.

63.    During the sixty days preceding the announcement of the Merger, Keryx shares traded as high as ***$5.98 per share***, over $2.00 above the $3.89 implied per share value of the Merger Consideration.

64.    Notably, each of Keryx and Akebia's stock fell on the announcement of the Merger. Akebia shares dropped nearly 20%, while Keryx's stock similarly fell approximately 18%.

65.    Further, the Company's own financial advisor, MTS, prepared three discounted cash flow ("DCF")[7] analyses of Keryx on a standalone basis, two of which resulted in per share

---

[7] A DCF analysis takes management's best estimates of projected cash flows (or cash flow equivalents), applies a terminal value (the value of a company's expected cash flows beyond the explicit forecast horizon) and a company-specific discount rate, and discounts the cash flows back to present value to estimate a current standalone valuation. It is considered the premier and most reliable valuation tool that a banker can employ in a merger context, because management's own internal projections (typically cash flows or unlevered free cash flows) are the core component of the analysis. *See, e.g.*, *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 916 n.53 (Del. Ch. 1999) (indicating that the Delaware Chancery Court has employed the DCF method as a method of valuation and that experts consider it to be the preeminent method of valuation).

values well above the implied deal price of $3.89 per share and the third produced a wider range of per share values with a similar midpoint as the other two DCF analyses.  Relying on the Keryx Management Keryx Projections, MTS performed DCF analyses (i) sensitizing a range of terminal exit revenue multiples and weighted average cost of capital, resulting in a per share value range of *$4.25 to $6.00*; (ii) sensitizing only the weighted average cost of capital, resulting in a per share value range of *$4.50 to $7.75*; and (iii) sensitizing revenue achievement and weighted average cost of capital, resulting in a per share value range of $2.75 to $7.75.

66.    While Keryx stockholders received the unfair Merger Consideration, the directors and executive officers were richly rewarded by the Merger.  Notably, Morrison received a $150,000 cash bonus on October 31, 2018 "in recognition of the considerable efforts undertaken by [her]" (Proxy at 128), as well as a $200,000 "cash retention payment" paid on the earlier of December 31, 2018 or closing of the Merger.  *Id.*  Moreover, Morrison negotiated a position for herself as a director of the combined company, along with four other Keryx Board members.

67.    On May 1, 2018, Keryx entered into "retention agreements" with each of Holmes, John F. Neylan ("Neylan"), Keryx's Chief Medical Officer, and Christine Carberry ("Carberry"), Keryx's Chief Operating Officer.  In addition to their pre-existing severance benefits, the terms of these retention agreements provided for additional bonuses payable to each of Holmes, Neylan and Carberry in the amounts of $200,000, $100,000 and $150,000, respectively.

**The Merger**

68.    On June 28, 2018, Keryx and Akebia issued a joint press release announcing the Merger.  The press release stated, in relevant part:

> CAMBRIDGE, Mass. & BOSTON--Jun. 28, 2018-- Akebia Therapeutics, Inc. (NASDAQ:AKBA) and Keryx Biopharmaceuticals, Inc. (NASDAQ:KERX) today announced that the companies signed, and the boards of directors of both companies have unanimously approved, a definitive merger agreement under

which the companies will combine in an all-stock merger. The Merger will create a fully integrated biopharmaceutical company focused on chronic kidney disease (CKD), with an implied pro forma equity value of approximately $1.3 billion, assuming full conversion of Keryx's outstanding convertible notes, based on the closing prices of Keryx and Akebia on June 27, 2018. The combined company will be named Akebia Therapeutics, Inc.

Under the terms of the agreement, Keryx shareholders will receive 0.37433 common shares of Akebia for each share of Keryx they own. The exchange results in implied equity ownership in the combined company of 49.4 percent for Akebia shareholders and 50.6 percent for Keryx shareholders on a fully-diluted basis. John P. Butler, President and Chief Executive Officer of Akebia, is expected to lead the combined company, and Keryx will appoint the Chairperson of the Board of Directors of the combined company. Additionally, Jason A. Amello, Akebia's Chief Financial Officer, is expected to serve in the same capacity on the management team of the combined company.

The Baupost Group, L.L.C., which owns approximately 21.4 percent of the outstanding Keryx common stock prior to any conversion of its convertible notes, has agreed to convert its outstanding convertible notes of Keryx into shares of Keryx common stock prior to closing and has entered into a voting agreement in support of the Merger. Muneer A. Satter, Chairperson of the Akebia Board of Directors and a shareholder who owns approximately 5.3 percent of outstanding Akebia common stock, has also agreed to support the Merger by entering into a voting agreement.

## The False and Misleading Proxy

69.    On October 30, 2018, Keryx filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Keryx's stockholders.  The Proxy, which recommended that Keryx's stockholders vote in favor of the Merger and was an essential link in the accomplishment of the Merger, omitted and/or misrepresented material information about the intrinsic value of Akebia and material information about the negotiations resulting in the $20 million windfall for Baupost, which misled Keryx's public stockholders into voting in favor of the Merger without material information regarding the critical decision they faced.

70.    Specifically, the Proxy omitted and/or misrepresented the material information set forth below in contravention of §§ 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9

promulgated thereunder regarding the true value and prospects of Akebia.  Keryx stockholders were entitled to the information necessary to make an informed decision as to the adequacy of the all-stock Merger Consideration, including the value of Akebia's true prospects based on Akebia's current development timeline for vadadustat, as well as the details underlying the negotiations of Baupost's $20 million windfall.

71.     The Proxy misled the Company's stockholders as to the reasonableness and reliability of the Keryx Management Akebia Projections and the Keryx Management Adjusted Akebia Projections.  The Proxy defined the term "Projections" to collectively refer to:

> (i) the Keryx Management Keryx Projections, (ii) the certain unaudited unadjusted prospective financial information of Akebia on a standalone basis provided by Akebia management to Keryx and MTS Securities to which Keryx management applied certain assumptions and adjustments to arrive at the Keryx Management Adjusted Akebia Projections, (iii) the Keryx Management Adjusted Akebia Projections, and (iv) the Keryx Management Akebia Projections . . . .

Proxy at 96.  On the same page, the Proxy stated that:

> with respect to the Projections, MTS Securities assumed, with the consent of the Keryx Board and based upon discussions with Keryx management and Akebia management, that each of the Projections **was reasonably prepared in good faith** and that the Projections, including any estimates of certain potential benefits of the Merger prepared by Keryx management and the timing to achieve such benefits, **reflected the best currently available estimates and judgments of Keryx management and Akebia management regarding the future results of operations and financial performance of Keryx and Akebia**.

*Id.* (emphasis added).

72.     These statements gave Keryx stockholders at least two false impressions.  First, these statements asserted that both Keryx management's Keryx Management Akebia Projections and Keryx Management Adjusted Akebia Projections reflected the best "estimates and judgments of Keryx management" for Akebia's future performance.  That was false.  A comparison of the Keryx Management Akebia Projections and Keryx Management Adjusted

Akebia Projections reveals two drastically different pictures of Akebia's future prospects ($ in millions):

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| Keryx Management. Akebia Projections Revenue | $ 258 | $ 152 | $ 146 | $ 154 | $ 153 | $ 207 | $ 284 |
| Keryx Management Adjusted Akebia Projections Revenue | $ 244 | $ 158 | $ 167 | $ 343 | $ 690 | $ 863 | $ 915 |
| Percent Change (rounded) | (5.4)% | 4.0% | 1.4% | 122.7% | 351.0% | 316.9% | 222.2% |
| Keryx Management Akebia Projections EBIT | $ (87) | $ (54) | $ (90) | $ (16) | $ (20) | $ 41 | $ 99 |
| Keryx Management Adjusted Akebia Projections EBIT | $ (175) | $ (65) | $ (56) | $ 144 | $ 470 | $ 601 | $ 645 |
| Percent Change (rounded) | (101.2)% | (20.4)% | 37.8% | 1,000.0% | 2,450.0% | 1,365.9% | 551.5% |
| Keryx Management Akebia Projections UFCF | $ (109) | $ (60) | $ (101) | $ (42) | $ (20) | $ 21 | $ 75 |
| Keryx Management Adjusted Akebia Projections UFCF | $ (193) | $ (97) | $ (50) | $ 72 | $ 336 | $ 417 | $ 517 |
| Percent Change (rounded) | (77.1)% | (61.7)% | 50.5% | 271.4% | 1,780.0% | 1,885.7% | 589.3% |

73.     Second, the Proxy falsely asserted that the Keryx Management Adjusted Akebia Projections reflected the "best currently available estimates" of Keryx and Akebia management. According to the Proxy, "[t]he Keryx Management Adjusted Akebia Projections were based on certain financial information provided to Keryx management by Akebia to which Keryx management applied its own assumptions for probability of success, estimated tax assets and rates, working capital and capital expenditures and depreciation and amortization." *Id.* at 93. Akebia provided Keryx management with the financial information underlying the Keryx Management Adjusted Akebia Projections on May 11, 2018. *Id.* at 75. At that time, Akebia anticipated top-line results for its Phase 3 vadadustat clinical trial programs in 2019. *See, e.g.,* May 9, 2018 Akebia Press Release, "Akebia Therapeutics Announces First Quarter 2018 Financial Results.[8] However, on the June 28, 2018 joint conference call following the announcement of the Merger, Butler revealed that "[Akebia] now expect[s] top-line data by mid-

---

[8] Available at: https://www.sec.gov/Archives/edgar/data/1517022/000156459018012395/akba-ex991_348.htm

2020 subject to MACE approval."[9]   As shown below, Defendants were aware of Akebia's updated guidance, yet failed to update the Keryx Management Adjusted Akebia Projections, and directed MTS to use these artificially inflated projections in the valuation analyses underlying its Fairness Opinion.

74.     According to the Proxy, on June 15, 2018, Butler had apparently informed defendant Morrison "that Akebia planned to update its guidance on the timing of top-line results for the vadadustat clinical trial programs."  Proxy at 79.  This development was significant as, in addition to any increased costs, two other organizations, FibroGen and GlaxoSmithKline are vying to bring drugs rivaling vadadustat to market.  One Jefferies' analyst predicted this delay would put Akebia 1-2 years behind FibroGen.  Yet, Keryx management and the Board failed to update the Keryx Management Adjusted Akebia Projections to reflect Akebia management's "best currently available estimates."

75.     The Proxy also touted financial analyses performed by MTS described on pages 98 through 106 of the Proxy, including its *Discounted Cash Flow Analysis – Keryx Management Adjusted Akebia Projections*, which is an Akebia valuation summarized on pages 101 and 102 of the Proxy (the "Adjusted Akebia Projection DCF").  Based upon the inclusion of the Adjusted Akebia Projection DCF in the Proxy, Keryx stockholders believed they were receiving stock in a company potentially worth between $13.50 and $51.00 per share on a standalone basis.  This grossly inflated valuation range is false, however, because the Adjusted Akebia Projection DCF is based upon the Keryx Management Adjusted Akebia Projections, which Defendants knew were inaccurately prepared.

76.     Moreover, the Proxy provides that, in determining to approve the Merger

_____

[9] Available at: https://www.sec.gov/Archives/edgar/data/1114220/000119312518207810/d85864 5d425.htm

Agreement, the Board considered important:

> The opinion of MTS Securities, rendered orally to the Keryx Board on June 27,
> 2018 (and subsequently confirmed in writing as of June 27, 2018), that, as of the
> date of the MTS Opinion and subject to the various assumptions made,
> procedures followed, matters considered and qualifications and limitations set
> forth therein, the Exchange Multiplier to be received by the holders of Keryx
> Shares (other than holders of Excluded Shares, Baupost and their respective
> affiliates) in the Merger is fair, from a financial point of view, to such holders . . .
> .

*Id.* at 85.

77.     These statements regarding the fairness of the Merger from a financial perspective
and the Board's good-faith reliance on MTS' Fairness Opinion, viewed in conjunction with the
improperly prepared financial projections, render the Proxy materially misleading.

78.     By falsely giving Keryx stockholders the impression that the Keryx Management
Adjusted Akebia Projections – and the Fairness Opinion based on these projections – were
reasonable, reliable, and accurate, Plaintiffs and the Class were forced to decide whether to
exchange the upside of owning Keryx on a standalone basis for Akebia shares based upon
incomplete and misleading information concerning the true value of those shares.

79.     Additionally, the Proxy failed to provide Keryx stockholders with all material
information about the negotiations resulting in the $20 million windfall for Baupost,
consideration that was not shared by all of Keryx's public stockholders.  Specifically, the Proxy
failed to disclose: (i) MTS' range of proposed valuations for the early conversion of the
Convertible Notes as discussed and reviewed with both the Special Committee and Keryx
management on June 10, 2018; (ii) Keryx management's preliminary proposal for the early
conversion of the Convertible Notes, presented to Baupost on June 11, 2018; (iii) Baupost's
valuation of an early conversion as communicated to Keryx management on June 11, 2018 and
discussed at the June 11, 2018 Special Committee meeting; (iv) Keryx management's subsequent

proposal made to Baupost later on June 11, 2018; and (v) MTS' overview of the financial information regarding the range of proposed valuations for an early conversion of the Convertible Notes presented and discussed with the Board at its June 17, 2018 meeting.

80.     Without this material information, Keryx stockholders did not know to what extent Baupost successfully negotiated its Transaction Bonus with the Company and Akebia.  As Baupost's negotiations with Keryx and Akebia regarding conversion of the Convertible Notes were simultaneous with Keryx and Akebia's Merger Consideration negotiations, Baupost was effectively competing with Keryx's remaining stockholders for a larger piece of the pie.  Without the above information, the Proxy misled Keryx stockholders as to the true nature of the Company's negotiations with Baupost for conversion of the Convertible Notes, the Additional Shares Baupost received in connection with the Merger, and Baupost's motives for supporting the Merger.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

81.     Plaintiffs repeat all previous allegations as if set forth in full.

82.     During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not materially false and misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

83.     By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted

material facts, including material information about the Company's and Akebia's financial projections, the valuation analyses that support the Fairness Opinion provided by the Company's financial advisor, and the background process leading to the Merger. The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

84.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would have viewed a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

85.     The Proxy is an essential link in causing Keryx stockholders to approve the Merger.

86.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

87.     Because of the false and misleading statements in the Proxy, Plaintiffs and the Class were damaged.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

88.     Plaintiffs repeat all previous allegations as if set forth in full.

89.     The Individual Defendants acted as controlling persons of Keryx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Keryx, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the

various statements which Plaintiffs contends are false and misleading.

90.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular Merger giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.   They were, thus, directly involved in the making of the Proxy.

92.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

93.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Keryx's stockholders were irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and preliminary and permanent relief, including injunctive relief, in their favor on behalf of Keryx, and against Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

B.    Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

C.    Awarding Plaintiffs and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

D.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees;

E.    Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated:  June 3, 2019

By   */s/ Ryan M. Ernst*
       Ryan M. Ernst (#4788)
       901 N. Market St., Suite 1000
       Wilmington, DE 19801
       Tel.: (302) 778-4000
       Email: rernst@oelegal.com

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
Email: fortunato@bespc.com

*Attorneys for Plaintiffs*