**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE KERYX BIOPHARMACEUTICALS, INC. | Lead Case No. 18-cv-01589-CFC |
| | CLASS ACTION |
| | CONSOLIDATED SHAREHOLDER LITIGATION |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs John Andreula and Abraham Kiswani ("Plaintiffs"), on behalf of themselves and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through their counsel, except as to those allegations pertaining to Plaintiffs, which are alleged upon personal belief, allege the following for their Second Consolidated Amended Class Action Complaint:

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a stockholder class action brought by Plaintiffs on behalf of themselves and all other public stockholders of Keryx Biopharmaceuticals, Inc. ("Keryx" or the "Company") against Keryx and the members of Keryx's Board of Directors (the "Board" or the "Individual Defendants," and together with Keryx, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the acquisition of Keryx by Akebia Therapeutics, Inc. ("Akebia") through Akebia's wholly owned subsidiary Alpha Therapeutics Merger Sub, Inc. ("Merger Sub") (the "Merger").

2.      On June 28, 2018, Keryx and Akebia announced the Agreement and Plan of Merger (as amended on October 1, 2018, the "Merger Agreement") to combine the two biopharmaceutical companies, both of which focus on developing and providing innovative therapies and medicines to patients with kidney disease.[1]   Under the terms of the Merger Agreement, each issued and outstanding share of Keryx common stock would be converted into the right to receive 0.37433 shares of Akebia common stock (the "Merger Consideration").  Although Akebia's lead product, vadadustat, was in Phase 3 clinical trials and not yet marketed, Keryx stockholders would only own 50.6% of the combined company, with Akebia stockholders owning 49.4%.

3.      The Merger is the product of a seriously flawed process designed to ensure the sale of Keryx to Akebia on terms preferential to Defendants and Keryx's largest stockholder and holder of convertible notes (the "Convertible Notes"),[2] Baupost, while delivering inadequate consideration to Plaintiffs and the other public stockholders of the Company.  Indeed, during the sixty days preceding the announcement of the Merger, Keryx stock traded as high as $5.98 per share, yet on the date of the Stockholder Vote (defined below) on the Merger the value of the Merger Consideration was only ***$3.43 per share***.  As recently as March 18, 2020, the Merger Consideration was worth a mere ***$1.53 per share***.

---

[1] At the time of the announcement of the Merger, Keryx had one marketed product called Auryxia (ferric citrate), an orally available, absorbable iron-based tablet approved by the U.S. Food and Drug Administration ("FDA") for two indications: (1) the control of serum phosphorus levels in patients with chronic kidney disease ("CKD") on dialysis; and (2) the treatment of iron deficiency anemia in adults with CKD not on dialysis.  Akebia had no marketed products, but its lead product candidate, vadadustat, is designed to provide therapies to patients with kidney disease utilizing hypoxia-inducible factor biology.
[2] According to the Proxy (defined below), The Baupost Group, L.L.C. ("Baupost") was the holder of approximately $164.75 million of Convertible Notes.  Proxy at 68.

4.      The Merger was driven by Baupost's self-interest.  In December 2017, John P. Butler ("Butler"), Akebia's President and Chief Executive Officer ("CEO") – and a former Baupost designee on the Keryx Board – contacted Keryx regarding a potential transaction.  Mutual due diligence ensued.  In February 2018, a Research and Development Committee of the Keryx Board (the "R&D Committee"), charged with reviewing Akebia's vadadustat clinical program, recommended the Board discontinue negotiations with Akebia.  Thereafter, Baupost bypassed the Board, contacted Akebia directly and conducted its own due diligence of Akebia.  Following the abrupt resignation of Keryx's then-President and CEO Gregory P. Madison ("Madison") on April 27, 2018, Baupost pressured the Board to re-engage with Akebia.  Before the ink dried on Madison's resignation letter, the Board authorized Keryx's newly appointed Interim CEO, defendant Jodie P. Morrison ("Morrison"), to contact Butler about reengaging in discussions regarding a potential transaction with Keryx.  On April 29, 2018, Morrison did so.  The Merger Agreement was signed within two months.

5.      Thereafter, Baupost used its position and leverage to secure, in addition to its pro rata share of the combined company and conversion of its Convertible Notes into equity, a transaction bonus worth an additional $20 million (the "Transaction Bonus").[3]  The Transaction Bonus, which diverted consideration away from Keryx's other public stockholders, was provided to Baupost to secure its support for the Merger in the form of a voting agreement in which Baupost agreed to vote its Keryx shares in favor of the Merger.

6.      The ease with which Baupost was able to secure the Transaction Bonus is not surprising given Baupost's entanglements with both Keryx and Akebia board members.

---

[3] The Transaction Bonus was delivered in the form of four million additional Keryx shares (the "Additional Shares") issued to Baupost in connection with the conversion under a Notes Conversion Agreement, dated as of June 28, 2018, by and among Keryx, Baupost and Akebia.

Specifically, (1) defendant Mark J. Enyedy ("Enyedy") had been appointed to the Board as an independent director at the request of Baupost, (2) Butler previously served as an independent member of the Board at the request of Baupost from December 2015 to September 2017, including as Chairman of the Board from May 2016 to September 2017, and (3) Ronald C. Renaud, Jr., a member of the Akebia board, served as CEO of Translate Bio, Inc., of which Baupost is an investor.

7.      Keryx's insiders, including defendant Morrison, had a strong financial interest in ensuring the Merger went through, as they stood to earn a substantial payout from accelerated vesting of equity awards, additional cash awards under preexisting employment agreements and retention agreements negotiated during the process leading to the Merger, as well as entitlement to severance benefits under preexisting severance arrangements.

8.      On October 30, 2018, to secure stockholder support for the unfair Merger, Keryx filed a materially false and misleading Schedule 14A Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.      Specifically, the Proxy contained the following materially false and/or misleading statements:

(i)      That "***Keryx management . . . [was] not aware of any material relevant developments or matters related to Keryx or Akebia or that may affect the Merger that were omitted or that remained undisclosed to MTS Securities***"[4] at the time MTS arrived at its Fairness Opinion on June 27, 2018 (Proxy at 96, emphasis added);

(ii)     That "***with the consent of the Keryx Board and based upon discussions with Keryx management***" Keryx  management's

---

[4] MTS Health Partners ("MTS Health") acted as Keryx's financial advisor in connection with the Merger.  On June 27, 2018, MTS Securities, LLC, an affiliate of MTS Health ("MTS"), presented both an oral and written opinion to the Keryx Board and special committee of the Board ("Special Committee") that the Merger was fair, from a financial point of view, to common stockholders of Keryx ("Fairness Opinion").  In arriving at the Fairness Opinion, MTS relied on the accuracy and completeness of information provided by Defendants.  Proxy at 95-97.

projections for Akebia utilized by MTS for the financial analyses underlying its Fairness Opinion "***reflected the best currently available estimates and judgments of Keryx management . . . regarding the future results of operations and financial performance of . . . Akebia***. (*Id.*, emphasis added); and

(iii)     That the Merger Agreement and the Merger "are advisable and in the best interests of Keryx and its shareholders" and "are advisable, fair to, and in the best interests of Keryx and its shareholders" (*Id.* at 4, cover letter to stockholders dated October 30, 2018; Notice of Special Meeting of Shareholders unnumbered page 2).

10.     As set forth in greater detail below, these statements were false or misleading, because (i) Keryx management was aware of material relevant developments or matters related to Akebia that may affect the Merger and that were omitted or remained undisclosed to MTS; (ii) Keryx management did not believe that its projections regarding the future results of operations and financial performance of Akebia, reflected its best currently available estimates and judgments; and (iii) Defendants knew that the Merger was not in fact "fair" to the Company's stockholders.

11.     In connection with the May 29, 2018 Special Committee meeting, Keryx management created two widely disparate sets of financial projections regarding Akebia's future prospects and directed MTS to prepare preliminary financial information to be discussed at the meeting.  These projections were: (1) Keryx Management Akebia Projections, based on Keryx management's own assumptions regarding the future prospects of Akebia's business (the "Akebia Projections"); and (2) Keryx Management Adjusted Akebia Projections, based on information provided by Akebia management about Akebia's business and future prospects on or about May 11, 2018, to which Keryx management applied its own assumptions and adjustments[5] (the

---

[5] The most important and impactful of these assumptions was "the cumulative probability of success through approval of Akebia's product candidate, vadadustat."  Proxy, at 94.

"Adjusted Projections").  Keryx then directed MTS to prepare ***preliminary*** financial information to be discussed at the meeting.  Proxy, at 76.

12.     Subsequently, the Defendants instructed MTS to utilize the identical Adjusted Projections in connection with its June 27, 2018 Fairness Opinion, most critically as the basis of MTS' Akebia *Discounted Cash Flow Analysis* (the "Akebia DCF").  The Akebia DCF, a summary of which is included in the Proxy,[6]  is perhaps the single most important analysis performed by MTS with respect to the per-share valuation of Akebia as a stand-alone entity.  Utilizing the Adjusted Projections as its foundational financial metric, MTS calculated an implied per-share valuation for Akebia ***as high as $51.00 per share***.  On June 27, 2018, Akebia's stock closed at $10.38 per share.  It is not difficult to understand how attributing such a lofty valuation to a prospective merger partner would sway Keryx stockholders to support the proposed deal.

13.     The problem with the Adjusted Projections is they were stale.  Akebia provided the Adjusted Projections to Keryx management on May 11, 2018, a mere two weeks after the April 29, 2018 reengagement, two weeks before Akebia's May 24, 2018 proposal, and nearly seven weeks before MTS' Fairness Opinion and the consummation of the Merger.  During the interim, there were significant developments with respect to vadadustat's prospects that materially affected Akebia's anticipated revenue stream.  These included a June 5, 2018 "type-C" meeting between Akebia and the FDA[7], and "additional information" regarding "assumptions around timing for clinical trial completion and commercial launch" that Akebia learned of between June 12, 2018 to June 14, 2018 that rendered certain key assumptions underlying its projections no longer applicable.  Proxy, at 79.

---

[6] Proxy, at 101-102.
[7] Proxy, at 77.

14.     Keryx management contemporaneously learned of the June developments concerning vadadustat, but apparently neglected to inform MTS or revise its own "assumptions" embedded in the Adjusted Projections.  Notably, on June 15, 2018 Butler informed defendant Morrison that Akebia planned to update its guidance on the timing of top-line results for the vadadustat clinical trial programs.  Although only a day earlier the Akebia board had advised Akebia management to update its projections to accurately reflect, among other things, "timing for clinical trial completion and commercial launch" of vadadustat (*Id*. at 79), Keryx management failed to update its own Akebia projections based on Akebia management's up-to-date guidance.

15.     The Adjusted Projections for Akebia were *wildly more optimistic* than Akebia management's projections for Akebia's business.  The impact the updated guidance and timing of top-line results for vadadustat had on the Akebia projections was hugely significant.  Akebia management's projections had cumulative revenues for the years 2019-2025 that were $1.778 billion lower than the revenue projections for the same time period for the Adjusted Projections.

16.     Defendants knew that the best available estimates of Akebia's future financial performance must contemplate a delayed developmental timeline for vadadustat, and that Keryx management's projections provided to MTS failed to account for this delayed timeline. Defendants were aware of this impending setback to Akebia on June 15, 2018, well before MTS rendered its opinion as to the fairness of the Merger Consideration and entry into the Merger. Thus, Keryx management was aware of material relevant developments or matters related to Akebia that affected the Merger and that were omitted or remained undisclosed to MTS and that the Adjusted Projections included in the Proxy could not have reflected Keryx management's best currently available estimates and judgments regarding the future results of operations and financial

performance of Akebia, based on the material information that was known to Keryx management on June 15, 2018.

17.     It is indisputable that the developmental timeline for vadadustat was of critical importance to Defendants.  In fact, on May 7, 2018, during the first Board meeting following Keryx's April 29 reengagement with Akebia, the Board expressed the following sentiment in support of reengagement: "…the results of Akebia's upcoming type-C meeting with the FDA would be known and taken into account before any agreement with Akebia would be entered into by Keryx, thereby mitigating the clinical  trial uncertainties identified by the R&D Committee in February."  Proxy, at 74.  In other words, understanding and "mitigating the clinical trial uncertainties" of vadadustat was a primary concern of the Defendants in evaluating a prospective deal with Akebia.  Yet when they were advised of a material change in the vadadustat developmental timeline, Defendants ignored the information to facilitate a vastly exaggerated valuation of Akebia.

18.     The Individual Defendants allowed MTS to utilize the Adjusted Projections in its financial analyses and disclosed the Adjusted Projections in the Proxy in order to make the Merger Consideration appear more favorable to Keryx stockholders and to mislead Keryx stockholders into believing Akebia's intrinsic value in the Merger was higher than it actually was.

19.     The special meeting of Keryx stockholders to vote on the Merger was held on December 11, 2018 (the "Stockholder Vote").  A majority of Keryx's stockholders voted to approve the Merger, and the Merger closed on December 12, 2018.  The materially false and misleading Proxy was an essential link in the consummation of the Merger, as the Stockholder Vote and resulting Merger could not have occurred without the dissemination of the Proxy.

20.     For these reasons as set forth in detail herein, Plaintiffs assert claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiffs seek to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

22.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the Mergers and wrongs complained of herein occurred in this District.

## THE PARTIES

24.     Plaintiff John Andreula was at all times relevant hereto a continuous stockholder of Keryx. Mr. Andreula was designated as Lead Plaintiff in this action by order of this Court dated April 2, 2019 (Dkt. No. 13).

25.     Plaintiff Abraham Kiswani was at all times relevant hereto a continuous stockholder of Keryx. Mr. Kiswani was designated as Lead Plaintiff in this action by order of this Court dated April 2, 2019 (Dkt. No. 13).

26.     Defendant Keryx was a Delaware corporation and maintained its principal executive offices at One Marina Park Drive, 12th Floor, Boston, Massachusetts 02210. Prior to the Merger, Keryx was a commercial stage biopharmaceutical company focused on the

development and commercialization of medicines for people with kidney disease.

27.     Defendant Kevin J. Cameron ("Cameron") served as a director of the Company from April 2007 through the completion of the Merger.

28.     Defendant Enyedy served as a director of the Company from September 2017 through the completion of the Merger and currently serves on the Akebia board of directors.

29.     Defendant Steven C. Gilman ("Gilman") served as a director of the Company from March 2016 through the completion of the Merger and currently serves on the Akebia board of directors.

30.     Defendant Michael T. Heffernan ("Heffernan") served as a director of the Company from June 2016 through the completion of the Merger and currently serves on the Akebia board of directors.

31.     Defendant Morrison served as Keryx's Interim CEO from April 30, 2018 and a director of the Company from June 2016 through the completion of the Merger and served on the Akebia board of directors from 2018 until her resignation on April 3, 2020.

32.     Defendant Daniel P. Regan ("Regan") served as a director of the Company from October 2013 through the completion of the Merger.

33.     Defendant Michael Rogers ("Rogers") served as a director of the Company from March 2016 through the completion of the Merger and currently serves on the Akebia board of directors.

34.     Defendants Cameron, Enyedy, Gilman, Heffernan, Morrison, Regan and Rogers are referred to herein as the "Board" or the "Individual Defendants" and collectively with Keryx, as the "Defendants."

**OTHER RELEVANT ENTITIES**

35.     Akebia is a biopharmaceutical company focused on the development and commercialization of renal therapeutics for patients living with kidney disease.  Akebia's late-stage product candidate, vadadustat, is an investigational, oral hypoxia-inducible factor prolyl hydroxylase inhibitor, or HIF-PHI, in global Phase 3 development for two indications: (1) anemia due to chronic kidney disease, or CKD, in adult patients on dialysis, or DD-CKD, and (2) anemia due to CKD in adult patients not on dialysis, or NDD-CKD.  Akebia is a Delaware corporation with its principal executive offices located at 245 First Street, Cambridge, Massachusetts 02142. Akebia's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "AKBA."

36.     Merger Sub was a Delaware corporation and a direct wholly owned subsidiary of Akebia.

**CLASS ACTION ALLEGATIONS**

37.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that owned Keryx common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38.     Plaintiffs' claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

39.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in the Class.  As of

October 22, 2018, there were 120,375,926 shares of Company common stock outstanding.  All members of the Class may be identified from records maintained by Keryx or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

40.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

•     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

•     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

•     Whether Plaintiffs and the other members of the Class have been damaged and the proper measure of damages.

41.     Plaintiffs will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiffs seek to represent.  Plaintiffs have retained competent counsel experienced in litigation of this nature.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

43.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

## **Background of the Company**

44.    Keryx was a commercial stage biopharmaceutical company focused on bringing innovative medicines to people with kidney disease.  The Company's marketed product, Auryxia (ferric citrate) tablets, is an orally available, absorbable iron-based medicine.  In September 2014, Auryxia was approved by the FDA for the control of serum phosphorus levels in patients with CKD on dialysis.  In November 2017, Auryxia was approved by the FDA for the treatment of iron deficiency anemia in adults with CKD not on dialysis.  Ferric citrate is also approved in Japan under the trade name Riona and marketed by the Company's Japanese partner, Japan Tobacco, Inc. and its subsidiary Torii Pharmaceutical Co., Ltd., and in Europe as Fexeric.

45.    Keryx generated positive financial results from sales of Auryxia.  For example, on February 7, 2018, Keryx announced its fourth quarter and full year 2017 financial results.  Full year 2017 net U.S. Auryxia product sales more than doubled in 2017 to $55.5 million, compared to $27.2 million for the full year 2016.  For the quarter, net U.S. product sales were $17.3 million, compared to $8.2 million in the fourth quarter 2016.  Total revenues for full year 2017 were $60.6 million, compared to $32.0 million in 2016.  For the quarter, total revenues were $18.7 million, compared with $9.5 million for the fourth quarter of 2016.  Approximately 30,400 Auryxia prescriptions were reported in the fourth quarter of 2017 compared to approximately 8,700 prescriptions in the fourth quarter of 2016.  Scott Holmes ("Holmes"), Keryx's Chief Financial Officer ("CFO"), commented on the strong financial results, stating:

> The strong prescription demand growth generated in the fourth quarter, coupled with the stabilization of the gross-to-net adjustment, led to $17.3 million of net U.S. Auryxia product sales in the fourth quarter of 2017. . . . As we enter 2018, we believe we will continue to drive Auryxia growth as a chronic kidney disease treatment for both hyperphosphatemia in the dialysis setting, as well as iron deficiency anemia in the non-dialysis setting.

On the February 7, 2018 earnings call, then-CEO Madison highlighted the Company's promising outlook, stating:

Our vision is to build a leading renal business and we believe we have an outstanding foundational medicine in Auryxia. In 2018, we're focused on driving growth in Auryxia in both the dialysis and the pre-dialysis setting. We'll build on our recent accomplishments as we seek to bring Auryxia to more patients who can benefit from its two indications.

46.     The positive news for Keryx stockholders continued. On May 10, 2018, Keryx announced its successful first quarter 2018 financial results due to sales of Auryxia. The Company reported a 96% increase in net U.S. Auryxia product sales of $20.6 million compared to $10.5 million in the first quarter of 2017. Approximately 34,600 Auryxia prescriptions were reported in the first quarter of 2018 compared to approximately 15,800 prescriptions in the first quarter of 2017. During the May 10, 2018 earnings call, Holmes commented on the quarter's successful results, stating, "First and foremost, we are making good commercial progress with 118% increase in prescription volume versus the first quarter of last year and a 96% increase in Auryxia net sales."

**The Process Leading Up to the Merger**

47.     In October 2015, Keryx raised $125 million through the private placement of convertible senior notes, due 2020, with funds managed by Baupost. In connection with the financing, Baupost received the right to appoint a director to the Board. On December 10, 2015, Keryx announced the appointment of Butler, Akebia's President and CEO, to the Board. Butler remained Baupost's designee on the Board, including serving as Chairman of the Board beginning in May 2016, until the Company announced his resignation on September 13, 2017.

48.     On December 8, 2017, Butler contacted Keryx's then-President and CEO Madison to discuss a potential transaction between Akebia and Keryx. The parties entered into a reciprocal confidentiality agreement and conducted initial due diligence. In connection with its due diligence, Keryx formed an R&D Committee which was charged with overseeing and reviewing the regulatory and clinical due diligence undertakings on Akebia with respect to the potential

transaction with Akebia.

49.     In early February 2018, members of Keryx management and its outside consultants met with the R&D Committee to discuss Akebia's vadadustat clinical program, as well as the timing and investment required to complete Akebia's vadadustat clinical program.  At a February 9, 2018 R&D Committee meeting, the R&D Committee determined to recommend that the Keryx Board discontinue pursuing a transaction with Akebia and reported its recommendation to the members of the Special Committee.

50.     On February 12, 2018, the R&D Committee reported to the Keryx Board the results of due diligence and certain uncertainties inherent in development stage companies.  The Board determined, based on the report and recommendation of the R&D Committee, to cease discussions with Akebia regarding a potential transaction at that time.  On February 16, 2018, Madison informed Butler that Keryx was not interested in pursuing a transaction with Akebia at that time.

51.     In March 2018, representatives of Baupost communicated to Akebia management that Baupost was interested in conducting diligence on Akebia and its clinical program.  Baupost and Akebia entered into a confidentiality agreement with the consent of the Akebia board, and thereafter, Akebia shared certain information with Baupost and Baupost's consultants, and engaged in discussions with Baupost regarding diligence over the next several weeks.

52.     On April 27, 2018, Madison abruptly resigned as the President, CEO and a director of the Company, effective immediately, with no explanation.

53.     With Madison out of the picture, Baupost pressured the Board to reconsider a merger with Akebia.  At an April 27, 2018 Board meeting, representatives of Baupost provided Keryx with access to a consultant who had conducted due diligence on Akebia, including on its clinical trial and research and development programs.  The Board determined that defendant

Morrison, Keryx's newly-appointed Interim CEO, should contact Butler to inquire as to whether Akebia would be interested in reengaging in discussions regarding a potential transaction with Keryx.  Defendant Morrison contacted Butler on April 29, 2018 and the parties reengaged in exploring a potential transaction.

54.    On May 11, 2018, Akebia management provided Keryx with certain unaudited prospective financial information of Akebia on a standalone basis.   Thereafter, Keryx management, along with MTS, reviewed these projections and applied certain assumptions and adjustments, to arrive at the Adjusted Projections.

55.    On May 24, 2018, Akebia sent Keryx a non-binding offer letter proposing a merger that would result in the stockholders of each company owning 50% of the combined company. The offer assumed, among other things, the full conversion of the Convertible Notes held by Baupost and that Baupost would provide a support agreement in favor of the transaction.

56.    At a May 29, 2018 Special Committee meeting, the Special Committee discussed Keryx's May 24, 2018 non-binding offer letter, Keryx's standalone prospects, the Adjusted Projections, the Akebia Projections and certain preliminary financial information prepared by MTS.  Keryx management reported to the Special Committee on the assumptions underlying the Adjusted Projections, which projections Keryx management had directed MTS to use to prepare its preliminary financial information discussed at the meeting.  The Special Committee determined to continue discussions with Akebia for a merger of equals.

57.    On June 7, 2018, members of the Akebia and Keryx management teams met with Baupost to discuss the proposed transaction and whether Baupost would be willing to convert the Convertible Notes in connection with, and would otherwise be supportive of, a merger of the two companies.  Baupost indicated that it would consider converting some or all of the Convertible

Notes as part of the transaction, but that it would request consideration for agreeing to convert the Convertible Notes prior to the closing of the transaction, in the form of equity of the combined company.

58.     Thereafter, on June 10, 2018, the Special Committee met and MTS presented financial information regarding a range of proposed valuations for the early conversion by Baupost of the Convertible Notes.  After discussion, the Special Committee authorized Keryx management and MTS to discuss the range of proposed valuations with representatives from Baupost.

59.     On June 11, 2018, defendant Morrison and other members of Keryx management presented to Baupost a range of proposed valuations for the early conversion by Baupost of the Convertible Notes.  Baupost indicated that the range at which Baupost was valuing an early conversion was considerably higher than the range of proposed valuations provided by Keryx, but agreed to take Keryx's proposal under consideration.  Baupost also reiterated that it would consider accepting consideration in the form of equity of the combined company.

60.     Later on June 11, 2018 at a Special Committee meeting, defendant Morrison reported on the call with Baupost, including the difference in valuation for the conversion posited by each of Baupost and Keryx.  Following discussion, including discussion of the range of proposed valuations prepared by Keryx management and MTS, the Special Committee decided that defendant Morrison should communicate Keryx's view of the value of the conversion to Baupost, which defendant Morrison relayed later that day.  The Baupost representative informed defendant Morrison that Keryx's valuation was unacceptable and that Baupost's valuation of the conversion was higher.

61.     On June 15, 2018, Butler informed defendant Morrison that Akebia planned to update its guidance on the timing of top-line results for the vadadustat clinical trial programs.

Although the Proxy reveals that only a day earlier the Akebia board had advised Akebia management to update its own projections to accurately reflect, among other things, "timing for clinical trial completion and commercial launch" of vadadustat[8], Keryx management failed to update its own projections for Akebia based on Akebia management's guidance.   Shortly thereafter, on the same day Akebia and Keryx announced the Merger (and the day after MTS presented its Fairness Opinion to the Board), Butler would publicly reveal that Akebia was delaying the timeline for its Phase 3 vadadustat trials, with top-line data expected in mid-2020 rather than 2019.  *Compare* Akebia Therapeutics and Keryx Biopharmaceuticals Joint Corporate Conference Call Transcript dated June 28, 2018, at 8 ("We now expect topline data by mid-2020 subject to MACE approval."),[9] *with* May 9, 2018 Akebia Press Release, "Akebia Therapeutics Announces First Quarter 2018 Financial Results" ("with top-line results [for Phase 3 studies] anticipated in 2019, subject to the accrual of major adverse cardiovascular events, or MACE").[10]

62.    Between June 15, 2018 (when defendant Morrison learned from Butler that Akebia's vadadustat clinical trial guidance needed to be revised), and June 28, 2018 (the day the Board agreed to adopt the Merger Agreement), the Special Committee met on June 23, 2018, the Board met on June 17, 2018 and June 24, 2018 and the Special Committee and the Board held a joint meeting on June 27, 2018.  The  Company's due diligence of Akebia continued, with Keryx management providing the Board with a report on Keryx's due diligence findings at the June 17, 2018 Board meeting and diligence items discussed by defendant Morrison at the June 23, 2018 Special Committee meeting and June 24, 2018 Board meeting.  As Keryx stockholders' fiduciaries

---

[8] Proxy, at 79.
[9] Available at:
https://www.sec.gov/Archives/edgar/data/1114220/000119312518207810/d858645d425.htm
[10] Available at: https://www.sec.gov/Archives/edgar/data/1517022/000156459018012395/akba-ex991_348.htm

it can be inferred that during the time between June 15 and June 27, 2018, Keryx management provided and discussed with the Board, Keryx management's reliable internal assessments, projections and evaluations of Akebia that were material to the Board's evaluation and consideration of the Merger.  This material information relating to Akebia necessarily had to have included Akebia's planned update to its guidance on the timing of top-line results for the vadadustat clinical trial programs.

63.     At a June 17, 2018 Board meeting, defendant Morrison reported on the status of the negotiations with Baupost and MTS provided an overview of the financial information regarding the range of proposed valuations for an early conversion of the Convertible Notes.  Additionally, Keryx management provided the Board with a report on Keryx's due diligence findings.

64.     Between June 18, 2018 and June 23, 2018, Akebia's Chief Business Officer, representatives of Keryx management and MTS spoke with Baupost representatives on the terms of the conversion of the Convertible Notes.  Following these discussions, Baupost proposed to Keryx that Baupost should receive appropriate consideration, proposed in the form of the Additional Shares (which represented approximately $20.0 million in value at that time).

65.     On June 20, 2018, the Akebia board met and in consultation with Akebia management, determined that, in order to cause Baupost and Keryx to convert the Convertible Notes and enter into a support agreement concerning the Merger, the most recent Baupost proposal would be acceptable to Akebia, resulting in the allocation of 4,000,000 Keryx shares to Baupost.

66.     Thereafter, the parties finalized the remaining terms of the Merger Agreement.  On June 27, 2018 MTS presented its Fairness Opinion based, in part, on the Adjusted Projections that did not reflect Akebia's planned update to its guidance on the timing of top-line results for the vadadustat clinical trial programs discussed at the June 15, 2018 meeting between Butler and

defendant Morrison, and thus could not have reflected the best currently available estimates and judgments of Keryx management regarding the future results of operations and financial performance of Akebia. The Board, Special Committee and Keryx management knew that the Adjusted Projections, which relied upon the obsolete timing of top-line results for the vadadustat clinical trial programs, were unreasonable. Yet, the Board and its Special Committee deliberately allowed MTS to continue to rely on the outdated Adjusted Projections, resulting in a flawed Fairness Opinion provided by MTS to the Board and presented to Keryx stockholders in the Proxy in order to "justify" the otherwise unjustifiably low Merger Consideration. The Board, upon the unanimous recommendation of the Special Committee, approved the Merger Agreement and the parties executed the Merger Agreement the next day.

67.     The Merger Consideration of 0.37433 shares of Akebia common stock per share of Keryx common stock was unfair to the Company's stockholders. For example, on June 27, 2018, the day MTS rendered its Fairness Opinion, the Merger Consideration represented just $3.89 per Keryx share, a significant ***discount*** to Keryx's same-day trading price of $4.48 per share.

68.     During the sixty days preceding the announcement of the Merger, Keryx shares traded as high as ***$5.98 per share***, over $2.00 above the $3.89 implied per share value of the Merger Consideration.

69.     Notably, each of Keryx and Akebia's stock fell on the announcement of the Merger. Akebia shares dropped nearly 20%, while Keryx's stock similarly fell approximately 18%.

70.     Further, the Company's own financial advisor, MTS, prepared three discounted cash flow ("DCF")[11] analyses of Keryx on a standalone basis, two of which resulted in per share

---

[11] A DCF analysis takes management's best estimates of projected cash flows (or cash flow equivalents), applies a terminal value (the value of a company's expected cash flows beyond the explicit forecast horizon) and a company-specific discount rate, and discounts the cash flows back

values well above the implied deal price of $3.89 per share and the third produced a wider range of per share values with a midpoint well above the $3.89 implied deal price. Relying on the Keryx Management Keryx Projections, MTS performed DCF analyses (i) sensitizing a range of terminal exit revenue multiples and weighted average cost of capital, resulting in a per share value range of ***$4.25 to $6.00 ($5.125 midpoint)***; (ii) sensitizing only the weighted average cost of capital, resulting in a per share value range of ***$4.50 to $7.75 ($6.125 midpoint)***; and (iii) sensitizing revenue achievement and weighted average cost of capital, resulting in a per share value range of ***$2.75 to $7.75 ($5.25 midpoint)***.

71.     While Keryx stockholders received the unfair Merger Consideration, the directors and executive officers were richly rewarded by the Merger. Notably, defendant Morrison received a $150,000 cash bonus on October 31, 2018 "in recognition of the considerable efforts undertaken by [her]" (*id.* at 128), as well as a $200,000 "cash retention payment" paid on the earlier of December 31, 2018 or closing of the Merger. *Id.* Moreover, defendant Morrison negotiated a position for herself as a director of the combined company, along with four other Keryx Board members.

72.     On May 1, 2018, Keryx entered into "retention agreements" with each of Holmes, John F. Neylan ("Neylan"), Keryx's Chief Medical Officer, and Christine Carberry ("Carberry"), Keryx's Chief Operating Officer. In addition to their pre-existing severance benefits, the terms of these retention agreements provided for additional bonuses payable to each of Holmes, Neylan and Carberry in the amounts of $200,000, $100,000 and $150,000, respectively.

---

to present value to estimate a current standalone valuation. It is considered the premier and most reliable valuation tool that a banker can employ in a merger context, because management's own internal projections (typically cash flows or unlevered free cash flows) are the core component of the analysis. *See, e.g.*, *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 916 n.53 (Del. Ch. 1999) (indicating that the Delaware Chancery Court has employed the DCF method as a method of valuation and that experts consider it to be the preeminent method of valuation).

**The Merger**

73.     On June 28, 2018, Keryx and Akebia issued a joint press release announcing the

Merger.  The press release stated, in relevant part:

> CAMBRIDGE, Mass. & BOSTON--Jun. 28, 2018--Akebia Therapeutics,
> Inc. (NASDAQ:AKBA) and Keryx Biopharmaceuticals, Inc. (NASDAQ:KERX)
> today announced that the companies signed, and the boards of directors of both
> companies have unanimously approved, a definitive merger agreement under which
> the companies will combine in an all-stock merger. The Merger will create a fully
> integrated biopharmaceutical company focused on chronic kidney disease (CKD),
> with an implied pro forma equity value of approximately $1.3 billion, assuming full
> conversion of Keryx's outstanding convertible notes, based on the closing prices of
> Keryx and Akebia on June 27, 2018. The combined company will be named Akebia
> Therapeutics, Inc.
>
> Under the terms of the agreement, Keryx shareholders will receive 0.37433
> common shares of Akebia for each share of Keryx they own. The exchange results
> in implied equity ownership in the combined company of 49.4 percent for Akebia
> shareholders and 50.6 percent for Keryx shareholders on a fully-diluted basis. John
> P. Butler, President and Chief Executive Officer of Akebia, is expected to lead the
> combined company, and Keryx will appoint the Chairperson of the Board of
> Directors of the combined company. Additionally, Jason A. Amello, Akebia's
> Chief Financial Officer, is expected to serve in the same capacity on the
> management team of the combined company.
>
> The Baupost Group, L.L.C., which owns approximately 21.4 percent of the
> outstanding Keryx common stock prior to any conversion of its convertible notes,
> has agreed to convert its outstanding convertible notes of Keryx into shares of
> Keryx common stock prior to closing and has entered into a voting agreement in
> support of the Merger. Muneer A. Satter, Chairperson of the Akebia Board of
> Directors and a shareholder who owns approximately 5.3 percent of outstanding
> Akebia common stock, has also agreed to support the Merger by entering into a
> voting agreement.

**The False and Misleading Proxy**

74.     On October 30, 2018, Keryx filed the materially incomplete and misleading Proxy

with the SEC and disseminated it to Keryx's stockholders in connection with the Merger.  The

Individual Defendants, as directors and officers of the Company, had a duty to carefully review

the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to

ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy contained materially misleading statements, in violation of Sections 14(a) and 20(a) of the Exchange Act.  The Defendants were thus negligent in their preparation and review of the Proxy.

75.    As set forth above, the Proxy contained the following materially misleading statements:

(i)    That "***Keryx management . . . [was] not aware of any material relevant developments or matters related to Keryx or Akebia or that may affect the Merger that were omitted or that remained undisclosed to MTS Securities***" at the time MTS arrived at its Fairness Opinion on June 27, 2018 (Proxy at 96, emphasis added);

(ii)    That "***with the consent of the Keryx Board and based upon discussions with Keryx management***" Keryx management's projections for Akebia utilized by MTS for the financial analyses underlying its Fairness Opinion "***reflected the best currently available estimates and judgments of Keryx management . . . regarding the future results of operations and financial performance of . . . Akebia***." (*see id.*, emphasis added); and

(iii)    That the Merger Agreement and the Merger "are advisable and in the best interests of Keryx and its shareholders" and "are advisable, fair to, and in the best interests of Keryx and its shareholders" (*see id.* at 4, cover letter to stockholders dated October 30, 2018; Notice of Special Meeting of Shareholders unnumbered page 2).

76.    These statements are false or misleading because they conveyed to the reasonable Keryx investor that (i) Keryx management was not aware of any material relevant developments or matters related to Akebia that may affect the Merger that were omitted or remained undisclosed to MTS; (ii) Keryx management's projections regarding the future results of operations and financial performance of Akebia reflected its best currently available estimates and judgments; and (iii) the Merger Agreement and Merger was advisable, fair to, and in the best interests of Keryx and its shareholders.

77.    As set forth above, defendant Morrison, the Company's CEO, Chairperson of the

Special Committee and Board member, was aware of material relevant developments related to Akebia based on her June 15, 2018, meeting with Butler, where Butler informed defendant Morrison that Akebia planned to update its guidance on the timing of top-line results for the vadadustat clinical trial programs.  This development was significant as, in addition to any increased costs, two other organizations, FibroGen and GlaxoSmithKline were vying to bring drugs rivaling vadadustat to market.  One Jefferies' analyst predicted this delay would put Akebia 1-2 years behind FibroGen.[12]  Akebia's board recognized the significance and impact the updated guidance and timing could have on the company and advised its management to update its own projections to accurately reflect, among other things, "timing for clinical trial completion and commercial launch" of vadadustat (*id*. at 79).

78.     As set forth in the tables below, the impact the updated guidance and timing of top-line results for vadadustat had on the Akebia projections was hugely significant.  For example, Akebia management's projections had cumulative revenues for the years 2019-2025 that were $1.778 billion lower than the revenue projections for the same time period for the Adjusted Projections.

**Risk-Adjusted Akebia Management Akebia Projections**
**(Standalone, Pre-Merger Basis)**
*($ in millions, unaudited)*

| | 2H 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| Akebia Revenue | $ 94 | $ 209 | $ 83 | $104 | $150 | $273 | $370 | $413 | $448 |
| EBIT | $ (112) | $(158) | $(104) | $ (33) | $ 25 | $134 | $220 | $258 | $291 |
| Free Cash Flow | $ (112) | $(158) | $(104) | $ (36) | $ 17 | $125 | $205 | $241 | $232 |

| | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 |
|---|---|---|---|---|---|---|---|---|---|
| Akebia Revenue | $ 516 | $ 501 | $ 527 | $555 | $584 | $666 | $589 | $295 | $147 |
| EBIT | $ 356 | $ 339 | $ 363 | $388 | $417 | $510 | $431 | $223 | $112 |
| Free Cash Flow | $ 261 | $ 249 | $ 266 | $284 | $306 | $374 | $319 | $190 | $ 95 |

---

[12] Available at: https://endpts.com/anemia-specialist-akebia-merges-with-keryx-on-the-eve-of-a-blockbuster-brawl-with-fibrogen/

**Keryx Management Adjusted Akebia Projections** [1]
**(Standalone, Pre-Merger Basis)** *($ in millions, unaudited)*

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| Akebia Revenue [2] | $ 169 | $ 244 | $158 | $167 | $343 | $690 | $863 | $915 |
| Operating Income (EBIT) | $(198) | $(175) | $ (65) | $ (56) | $144 | $470 | $601 | $645 |

(1)  Included certain assumptions relating to the business and operations of Akebia deemed appropriate by Keryx management, including for the cumulative probability of success through approval of Akebia's product candidate, vadadustat.

(2)  Akebia Revenue is defined for purposes of the Keryx Management Adjusted Akebia Projections as Akebia's share of U.S. net product sales plus revenue from collaboration partners.

In addition, at the direction of Keryx management, MTS Securities calculated, from the Keryx Management Adjusted Akebia Projections provided to MTS Securities by Keryx management for the calendar years ending 2018 through 2025, unlevered free cash flow as set forth below.

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| Unlevered Free Cash Flow [1] | $(201) | $(193) | $(97) | $(50) | $ 72 | $336 | $417 | $517 |

79.     The Individual Defendants withheld this information in order to make the Merger Consideration appear more favorable to Keryx stockholders and to mislead Keryx stockholders into believing Akebia's intrinsic value in the Merger was higher than it actually was.

80.     Keryx management and the Individual Defendants knew that if the projections were appropriately adjusted to reflect Akebia's planned update to its guidance on the timing of top-line results for the vadadustat clinical trial programs, the exchange ratio would be unfair to Keryx stockholders and that MTS would not be able to render a fairness opinion in connection with the Merger.

81.     The Proxy touted the financial analyses performed by MTS described on pages 98 through 106 of the Proxy, including its Akebia DCF, which is an Akebia valuation summarized on pages 101 and 102 of the Proxy.  Based upon the inclusion of the Akebia DCF in the Proxy, Keryx stockholders believed they were receiving stock in a company potentially worth between $13.50 and $51.00 per share on a standalone basis.  If MTS had been provided with appropriately adjusted Akebia projections, the implied per share ranges resulting from its DCF would have been significantly decreased and would have informed Keryx stockholders of the real potential value of Akebia and financial aspects of the Merger.

82.     Without  a  positive  fairness  opinion  from  MTS,  the  Merger  would  not  appear

favorable to, and would be at risk of being rejected by, Keryx stockholders, imperiling the financial rewards Keryx management and Baupost stood to receive from the Merger.

83.     Indeed, defendant Morrison and other Company insiders, had a strong financial interest in ensuring the Merger was approved, as they stood to earn a substantial payout from accelerated vesting of equity awards, additional cash awards under preexisting employment agreements and retention agreements negotiated during the process leading to the Merger, as well as entitlement to severance benefits under preexisting severance arrangements.

84.     Defendant Morrison received a $150,000 cash bonus on October 31, 2018 "in recognition of the considerable efforts undertaken by [her]" (*id*. at 128), as well as a $200,000 "cash retention payment" paid on the earlier of December 31, 2018 or closing of the Merger.  *Id.* Moreover, defendant Morrison negotiated a position for herself as a director of the combined company, along with four other Keryx Board members.

85.     Additionally, on May 1, 2018, Keryx entered into "retention agreements" with each of Holmes, Neylan, and Carberry.  In addition to their pre-existing severance benefits, the terms of these retention agreements provided for additional bonuses payable to each of Holmes, Neylan and Carberry in the amounts of $200,000, $100,000 and $150,000, respectively.

86.     Moreover, Baupost, in addition to receiving its pro rata share of the combined company and conversion of its Convertible Notes into equity, reaped the rewards of the $20 million Transaction Bonus.

87.     Furthermore, the statements in the Proxy indicating that the Merger Agreement and the Merger "are advisable, fair to, and in the best interests of Keryx and its shareholders," (*see id.* at 4, cover letter to stockholders dated October 30, 2018; Notice of Special Meeting of Shareholders unnumbered page 2), were false or misleading because, for the reasons set forth

herein, the Merger Consideration was not in fact fair to the Company's stockholders, and Defendants and Company management knew so.  Indeed, the Defendants and management knew that: (i) Baupost had divergent interests from Keryx's public stockholders and engineered the Merger for their own purposes; (ii) Keryx management's projections for Akebia did not reflect its best currently available estimates and judgments regarding the future results of operations and financial performance of Akebia; (iii) the Company's fourth quarter 2017 and first quarter 2018 results were very positive and management reiterated its confidence in the Company's growth prospects; and (iv) two of MTS' DCF analyses of Keryx on a standalone basis resulted in per share values well above the implied deal price of $3.89 per share and the third DCF analysis produced a wider range of per share values with a midpoint well above the $3.89 implied deal price.  In light of these facts, the above-referenced statements were false or misleading, as Defendants and management in fact knew that the Merger Consideration was not fair to the Company's stockholders and undervalued their shares.

88.     In short, the Proxy contained materially false or misleading statements, in violation of Section 14(a) and SEC Rule 14a-9 promulgated thereunder.  The false and misleading Proxy was an essential link in the consummation of the unfair Merger.

**The Materially False and Misleading Proxy Was an Essential Link in the Consummation of the Merger, Which Caused Plaintiffs and the Class Financial Loss, as Their Shares Were Worth More Than the Merger Consideration.**

89.     As a result of the unfair Merger, which could not have been consummated without the materially false and misleading Proxy, Plaintiffs and the Class suffered financial loss in that their shares were worth significantly more than the Merger Consideration.

90.     For example, on June 27, 2018, the day MTS rendered its Fairness Opinion, the Merger Consideration represented just $3.89 per Keryx share, a significant *discount* to Keryx's

same-day trading price of $4.48 per share.

91.     During the sixty days preceding the announcement of the Merger, Keryx shares traded as high as ***$5.98 per share***, over $2.00 above the $3.89 implied per share value of the Merger Consideration.

92.     Notably, each of Keryx and Akebia's stock fell on the announcement of the Merger. Akebia shares dropped nearly 20%, while Keryx's stock similarly fell approximately 18%.

93.     Further, the Company's own financial advisor, MTS, prepared three DCF analyses of Keryx on a standalone basis, two of which resulted in per share values well above the implied deal price of $3.89 per share and the third produced a wider range of per share values with a midpoint well above the $3.89 implied deal price.  Relying on the Keryx Management Keryx Projections, MTS performed DCF analyses (i) sensitizing a range of terminal exit revenue multiples and weighted average cost of capital, resulting in a per share value range of ***$4.25 to $6.00 ($5.125 midpoint)***; (ii) sensitizing only the weighted average cost of capital, resulting in a per share value range of ***$4.50 to $7.75 ($6.125 midpoint)***; and (iii) sensitizing revenue achievement and weighted average cost of capital, resulting in a per share value range of ***$2.75 to $7.75 ($5.25 midpoint)***.

94.     In sum, the Merger Consideration the Company's stockholders received was unfair and inadequate because the intrinsic value of their shares materially exceeded the Merger Consideration, particularly in light of the Company's strong prospects for future growth and earnings.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

95.     Plaintiffs repeat all previous allegations as if set forth in full.

96.     During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not materially false and misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

97.     By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted material facts, including material information about the information provided to MTS concerning Akebia's financial projections, and the relevant material information considered and discussed by the Board for its determination to enter into the Merger.  The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

98.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would have viewed a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

99.     The Proxy is an essential link in causing Keryx stockholders to approve the Merger.

100.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

101.    Because of the false and misleading statements in the Proxy, Plaintiffs and the Class were damaged.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

102.    Plaintiffs repeat all previous allegations as if set forth in full.

103.    The Individual Defendants acted as controlling persons of Keryx within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Keryx, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

104.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular Merger giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were, thus, directly involved in the making of the Proxy.

106.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Proxy

purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

107.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

108.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Keryx's stockholders were irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.   Ordering that this action may be maintained as a class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class counsel;

B.   Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

C.   Awarding Plaintiffs and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

D.   Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees;

E.   Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

F.       Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated:  July 2, 2020                                          **O'KELLY & ERNST, LLC**

                                                             */s/ Ryan M. Ernst*
                                                             Ryan M. Ernst (#4788)
                                                             824 N. Market St., Suite 1001A
                                                             Wilmington, DE 19801
                                                             Tel.: (302) 778-4000
                                                             Email: rernst@oelegal.com


**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
Email: fortunato@bespc.com

*Attorneys for Plaintiffs*